**Theresa A. DEMORET and
Robin Pell, Plaintiffs,**

v.

**Philip ZEGARELLI, individually, Dwight Douglas, individually, and the Village of Sleepy Hollow, New York, Defendants.**

**No. 03 CIV.1954(SCR).**

United States District Court,
S.D. New York.

March 4, 2005.

Kim Patricia Berg, Lovett & Gould, White Plains, NY, for Plaintiffs.

James P. Clark, Rains & Pogrebin, P.C., Mineola, NY, Brian T. Carr, Jack Babchik, Babchik & Young, L.L.P., White Plains, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

### I. Background

Theresa A. Demoret ("Demoret") and Robin Pell ("Pell") (collectively the "Plaintiffs") brought this action pursuant to Title VII, the Fourteenth Amendment, and the New York State Executive Law § 296 claiming that they were subject to a hostile work environment, adverse employment actions based on their sex, and retaliation for complaining about discrimination as employees of The Village of Sleepy Hollow (the "Village"). Philip Zegarelli (the "Mayor") served as mayor of the Village during the relevant time period. Zegarelli hired Dwight Douglas (the "Administrator") as the Village's Administrator. Douglas has a personal role in personnel decisions in that he gives advice and makes recommendations to the Mayor and the Village Board with respect to personnel matters in the Village, including decisions to hire, fire, discipline, and set salaries. The Mayor directly supervises the Administrator, and the Administrator directly supervises the Plaintiffs. Demoret served in the title of Secretary/Assistant to the Mayor and the Administrator from August 1997 to September 2003. Pell was hired as the Village Recreation Supervisor in 1998 and continues in that role today.

This Court previously denied Defendants' motions for summary judgment because defendants failed to show the absence of any issues of material fact. Defendants subsequently moved for reconsideration. The motion for reconsideration was denied. This decision addresses the Mayor and Administrator's (collectively the "Defendants") motions for summary judgment based on their claims of qualified immunity.

### II. Standard of Review

Summary judgment is appropriate only if "there is no genuine issue as to any material fact[.]" FED. R. CIV. P. 56(c). Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* The initial burden falls on the moving party who is required to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

### III. Qualified Immunity

#### A. The Motions

Defendants argue the undisputed evidence in the record establishes that: (1) the evidence in the record does not support a finding that the Defendants' conduct violated either Plaintiff's equal protection rights; and (2) even assuming, *arguendo,* a constitutional violation may have occurred, the Defendants' conduct toward the Plaintiffs was objectively reasonable. In order to discern whether qualified immunity is applicable in this case, Defendants propose the controlling legal standard as a two-part test. First, the Court is required to determine whether the fact, viewed in the light most favorable to the plaintiff, establish a constitutional violation committed by the individual seeking qualified immunity. If not, the plaintiff may not recover because she has suffered no wrong cognizable under § 1983. If the facts do establish a constitutional violation, the Court must then determine whether it would be clear

to a reasonable person in the defendant's situation that his actions were unlawful. In support of this two-part test, Defendants cite *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

In response, Plaintiffs assert Defendants are not entitled to the defense of qualified immunity because there are disputed material issues of fact, in particular that gender was a motivating factor, a claim for qualified immunity is not applicable.

## B. Qualified Immunity Standard

■ "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). First, the Court must determine whether the Defendants' conduct violated a clearly established constitutional right based on the facts viewed in the light most favorable to the Plaintiffs. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, the Court then considers if the Defendants' actions were objectively reasonable. *Id.* at 232–33, 121 S.Ct. 2151.

## C. Analysis

■ There is no doubt, as Defendants agree, that the Equal Protection Clause of the Fourteenth Amendment bars discrimination on the basis of, *inter alia*, gender. It is well-established in this Circuit that the Equal Protection Clause requires the government to treat all similarly situated people alike. *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir.2001). Here, Plaintiffs allege that the Defendants discriminated against them on the basis of their female gender. The evidence is viewed in the light most favorable to the Plaintiffs to ascertain whether Plaintiffs have supported their claims of constitutional violation.

### 1. Hostile Work Environment Claims

■ A work environment is considered hostile when ridicule, insult and abusive behavior has become "sufficiently severe or pervasive as to alter the conditions of the victim's employment." *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir.2001). Plaintiffs must show that a series of incidents when taken together, as opposed to individually, were sufficiently continuous or concerted so as to create an atmosphere of discriminatory intimidation, ridicule or insult. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000). "[E]ven where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such instances may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile work environment cause of action." *Raniola*, 243 F.3d at 617. Acts based on the prohibited bias that are directed at other employees can support Plaintiffs' claims of discrimination. See *Cruz*, 202 F.3d at 570. Plaintiffs must show that the environment was "both subjectively and objectively abusive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■ Plaintiffs claim that "Defendants created and condoned an environment that, as a whole, was abusive, hostile, demeaning, riddled with insult and ridicule and therefore altered the conditions of their employment due to Plaintiffs' sex." They contend that the Village is an "old boys club," in the words of Village Trustee

Higle, and argue that the Village is one where women were never allowed to be part of the group, were ostracized, demeaned, subjected to unjustified scrutiny, ridicule, insult, and criticism, verbally attacked in front of their co-workers, and subjected to different rules from male employees.

Specifically, plaintiffs claim that the Administrator treated Demoret disrespectfully and unprofessionally. They allege that he did not give her credit for her work, ask for her input, provide her with meaningful job duties, or treat her with even the most common courtesies such as by saying good morning. It is alleged he regularly and repeatedly questioned her in a condescending voice about tasks she had performed correctly. He allegedly told her that Department of Public Works jobs, all held by male employees, were much harder than office jobs which were not difficult, such as the one she had. He relegated her to the most basic secretarial duties (typing, photocopying, answering the phone) and removed her from special projects and meaningful assignments, giving many of her former tasks to a male summer college intern. Plaintiff alleges that when he did permit her to perform more complex work, such as creating a complex spreadsheet, he minimized her contribution and told her that the computer basically did all the work for her. The Administrator allegedly did not support her when she complained that male employees treated her in an abusive, aggressive and hostile fashion, laying the blame on her for failing to handle things "correctly." After Demoret complained of the Administrator's "bullying and discrimination" in September 2001, the Plaintiff alleges that the Administrator began monitoring her time and attendance in an intentionally obvious manner, as well as staring at her when she had conversations at her desk.

Demoret further alleges that when she complained to the Mayor in May 2001 about the Administrator's conduct, the Mayor began removing job duties and responsibilities from her. The Plaintiff alleges that by May 2003 she was left with little or no work to do, sometimes sitting idle at her desk for days at a time. The Mayor removed from her previously assigned responsibilities including working on the Village newsletter, payroll, and working with the Mayoral stamp. Demoret claims that after she filed her EEOC charge in January 2002, the Administrator shunned her and the Mayor stopped speaking with her. Demeaning comments and jokes were made by Defendants at department head meetings regarding the numerous lawsuits filed against the Village.

In May 2003, Demoret was transferred to an isolated third floor office. She was told she could no longer go to the board room, was prohibited from answering Defendants' telephone lines and opening their mail, and was not provided with a functioning computer or printer for months. It is alleged that the Defendants ignored her and made her travel to another floor in the building to receive her work assignments.

Generally, Demoret contends that she observed the Administrator treat women, including her, differently than men. With men, she alleges, the Administrator exhibited professionalism, courtesy, and respect. He engaged them in social conversation and exchanged social courtesies with them. He did none of this with Plaintiffs. She observed him monitoring only female employees' attendance and whereabouts—not males. She observed the Defendants treat Pell poorly compared to male employees, who were treated with respect. For instance, male employees were not questioned about their lateness or absences and were not required to submit reports or

answer questions as Pell was required to do.

Pell alleges that she too observed the Administrator treating male employees better than female employees. She complains that he spoke with her in a condescending, accusatory and uncivil manner; lectured her; did not extend the same basic social courtesies he extended to male employees such as saying good morning. The Administrator told her that her ideas were foolish and failed to support her in connection with complaints she registered about male employees and instead placed the blame on her. Pell contends that she was subject to micro-management and unjustified scrutiny and criticism at the individual department head. She further contends that a female coworker, Napoli, was subjected to the same treatment. Pell alleges that the Administrator stated that it was acceptable for the male employees to miss the department head meetings because they were doing important work. Pell further complains that the Administrator required her to attend Recreation Committee meetings where he would direct her to implement a program, and then when the task was nearly complete, he would change the idea of the program or drop it altogether. Pell maintains that she was often chastised and humiliated during weekly department head meetings. Pell alleges that although attendance at committee meetings was not mandatory, Pell received written memoranda when she did not attend. She alleges that male employees who did not attend the meetings did not receive any written document. Pell further claims that she was twice removed from her office so that a male employee could have it, and that Napoli, another female employee, was required to take a storage closet as an office so that a male employee could have a better office.

Pell claims that despite the fact that when she was hired with the understand-ing that she would receive overtime, she was prohibited from earning overtime and compensation time for additional hours. In contrast, male employees received over-time and/or compensation time. Allegedly, they were not subjected to monitoring or questioning about their hours of work.

Pell alleges that the Defendants re-moved her full-time subordinates from her supervision in Spring 2002 without her knowledge, only notifying her after the fact via written memorandum.

Additionally, Plaintiffs allege that the Administrator stated that a sexual harass-ment seminar was being held because "women do foolish things." It is alleged that it was further stated that harassment seminars were a waste of time and money and that it was pointless for some Village employees. They allege that these semi-nars elicited laughter and jokes from males employees at department head meetings.

When Pell complained to the Administra-tor that male employees were treated better than female employees, he told her that she gets "too emotional." The Mayor said the same thing after Trustee Higle repeatedly relayed Pell's complaints to him, stating that he did not want to hear her complaints any more.

Taking the totality of the circumstances into account in the light most favorable to the Plaintiffs, I find that the Plaintiffs offer sufficient evidence to support the ex-istence of a hostile work environment. The actions alleged, taken in the aggre-gate, altered the conditions of Plaintiffs' employment. Further, as alleged the De-fendants' conduct was not objectively rea-sonable, and the Defendants were aware of and violated the clearly established right.

## 2. Disparate Treatment

Employment discrimination actions un-der both federal law and N.Y. Human

Rights Law are resolved under the burden shifting analysis first introduced in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff must establish a prima facie case of discrimination against the employer. Once a plaintiff has established the prima facie case, the burden shifts to the employer to demonstrate a legitimate, non-discriminatory reason for the action. The plaintiff then has the opportunity to demonstrate that the reason proffered by the defendant is pretextual in nature and that the actions were motivated by discrimination. *Id.* In order to establish a prima facie case of gender discrimination, plaintiffs must show the following: (1) they are members of a protected class; (2) their job performance was satisfactory; (3) they suffered adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. *Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir.2001)(citing *Luciano v. Olsten Corp.*, 110 F.3d 210, 215); *Graham v. Long Island Railroad*, 230 F.3d 34, 38 (2d Cir. 2000).

▇▇▇ Plaintiffs meet the first prong of establishing a prima facie case. Defendants do not present evidence of poor job performance as a reason for the actions taken with respect to Plaintiffs. Defendants, instead, argue that the actions complained of were results of nondiscriminatory managerial decisions. The third required feature of such a prima facie case—Plaintiffs suffered adverse employment action—has been met on Plaintiffs' claims. "Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or oth-

er indices ... unique to a particular situation.'" *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir.2004) (citing *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000)). "As these examples suggest, 'to be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (citation and internal quotation marks omitted).

▇▇▇ Plaintiff Demoret contends that she suffered a loss of economic benefit as she was not provided with salary increases equivalent to males. Demoret compares her salary increases to those of department heads. Demoret also did not receive additional salary or stipends for performing additional responsibilities. She argues that Defendants contention that other employees are not similarly situated is unavailing. She is incorrect. The employees she compares herself to are not similarly situated. Therefore, differences in salary increases and additional monies for additional duties are not comparable occurrences.

Pell started as a member of the United Federation of Police Officers union (the "Union"). However, her classification as a Union member appears to have changed during her employment. For example, Pell points out that her title as Recreation Supervisor was not included in the Union contract. Therefore, she was prohibited from attending a negotiation session with respect to the then expiring contract. She also was advised verbally and in writing by Defendants that her position was not covered by the collective bargaining agreement. Pell has showed that she is paid less than other department heads, all of whom are male. In fact, she was paid less than subordinate employees that she supervised. In 2002, the Administrator began prohibiting Pell from earning over-

time or comp time. From that date forward, Pell alleges that she was the only employee required to submit written requests to work overtime in advance to the Administrator. These weekly schedules were reviewed by the Mayor. These new procedures reduced her income and made performing her duties difficult since she often worked additional hours. Male employees were not required to do the same and did accrue comp and overtime hours. Male employees would submit handwritten requests without a breakdown of date, hours, and reason as was required of Pell.

In addition, other financial benefits were not shared equally with women. Pell and Napoli did not receive Village vehicles despite the fact that all other department heads—all male—did receive vehicles upon hire. Pell received a vehicle after one year of employment but claims it was an older automobile. Pell further alleges that she was able to select a new vehicle but since male employees were permitted to order their vehicles months before her she was left using her older vehicle. Despite the fact that Napoli's predecessor had a Village vehicle, Napoli was not given a vehicle. Viewing the allegations in the light most favorable to Pell, she sufficiently proves adverse employment action—particularly a loss of income and other financial benefits. These actions action occurred under circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. The Administrator made recommendations to the Mayor on financial benefits and served as a supervisor to the Plaintiffs. The Administrator and the Mayor were aware of the discrepancies and failed to correct them. Therefore, Pell's various disparate wage allegations may go forward against the Defendants as adverse employment claims. Furthermore, Pell established that some of this behavior was retaliatory in nature. Defendants made these decisions with regard to Pell knowing that her rights were protected from this type of discrimination. Therefore, a claim that the choices made were reasonable must fail.

### 3. Retaliation Claims

■ To support a claim of retaliation, Plaintiffs must show that (1) they engaged in a protected activity; (2) the employer was aware of the protected activity; (3) they suffered adverse action; and (4) a causal connection exists between the protected activity and the adverse action. *Raniola*, 243 F.3d at 624 (citing *Gordon v. New York City Bd. of Ed.*, 232 F.3d 111, 116 (2d Cir.2000)) and *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir.2001).

■ Plaintiffs' conduct of complaining internally to Defendants and to the trustees, filing an EEOC Charge, and filing a federal lawsuit all constitute protected activities. Defendants were aware of all three actions. Thus, Plaintiffs meets the first two elements. Next, it must be determined whether an adverse employment action took place. In making this determination, I bear in mind that "because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of adverse." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997). Generally, to be considered "materially adverse," a change in working conditions must amount to an action more disruptive than a mere inconvenience or an alteration of job responsibilities. *Weeks v. New York State and Hoy*, 273 F.3d 76, 85 (2d Cir.2001). Examples of adverse employment actions include termination, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsi-

bilities, or other indices unique to a particular situation. See *id.*

■■■■■ All that Plaintiffs need to demonstrate regarding causation is that retaliation was a substantial or even just motivating factor in the adverse employment actions. *Raniola,* 243 F.3d at 625. The Court may rely on direct evidence of retaliatory animus or solely on circumstantial evidence such as the timing of the adverse action in relation to the protected activity, differential treatment of other employees who engaged in similar conduct, or, under some circumstances, by rebutting the employer's proffered reason for the termination. *Id.* There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *Gorman–Bakos v. Cornell Coop. Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001). In general, the two events should be "very close" in time. *See Clark County School Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). An employee need only have a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)(internal citations omitted).

After bringing the internal complaint, filing the EEOC charge, and the instant suit, Plaintiffs' job responsibilities were taken away and their offices were relocated. Following the filing of the EEOC charge, Pell was accused of alleged misconduct in a series of memoranda. Some of the conduct was similar to that of male employees, such as approving overtime for a family member and/or subordinate employee. After the instant suit was filed, Pell received more memoranda from the Administrator questioning her hours worked and reducing those hours. In addition, the Administrator began removing some of her job responsibilities. Pell was repeatedly required to move offices, including one described as a storage space with no windows, heat, air conditioning, or ventilation. The Mayor also gave one of her offices to a male employee. Her first office was also vacated but a male employee was placed in it. The second office lacked heat. Pell complained again and was told to "just move." She was denied access to her equipment by a male employee who prevented her right of entry by changing the locks. Upon another complaint, the Defendants refused to give her a key and instead instructed her to have a custodian open the office each time she needed access. Her allegations, taken in the light most favorable to Pell, amount to more than just inconveniences or small disruptions. Based on the foregoing, the Court finds that adverse employment actions were taken against Pell.

■■■ Next, the Court makes a determination as to whether a causal relationship exists between Pell's protected activity and the Defendants' adverse employment actions. After filing the EEOC Charge in January of 2002, Pell was asked to immediately begin providing all her employees' time sheets, was accused of misconduct in March and subjected to a disciplinary interview, subjected to critical memoranda, was refused the title of Superintendent, had her subordinates removed, and had her supervisory responsibilities removed. Plaintiffs allege that following the filing of the lawsuit in March of 2003, Pell was subjected to critical memoranda within a month, her hours were reduced and her time questioned, and her responsibility for clean up at the parks was removed in May. Because the adverse employment actions against Pell began immediately after she filed the EEOC Charge, a temporal relationship is evident. Finding the necessary temporal relationship, the adverse employ-

ment actions are considered retaliatory in nature. Therefore, Defendants are not entitled to qualified immunity with respect to Pell's retaliation claim.

 Demoret lost job responsibilities to a male employee after she complained of gender discrimination to the Mayor. She was often left with little to nothing to do. Responsibility for the payroll, the Mayoral stamp, and finally the newsletter were also removed. Demoret was monitored closely for tardiness and was watched at her desk by the Administrator. The Defendants also avoided Demoret and did not converse with her as they had before the filing of the EEOC charge. Despite being advised that the Village calendar would be delayed, the Mayor "ranted and raved" in earshot of other personnel with the Administrator on the speakerphone about the calendar's postponement. Male employees were not treated in that manner. Next, Demoret was moved to a different office. In fact, she was moved to the storage closet formerly held by Pell. Defendants admit that the relocation was at least partly causally connected to the lawsuit. She was issued a memorandum regarding her move which states: "Because of the allegations you have levied against both the Mayor and I, it has simply become untenable to continue working in such a difficult atmosphere." It also advised her that she would no longer answer Defendants' phone or open their mail, should not go into the boardroom, and should not take messages for their visitors but instead send them to another floor. After the reassignment, her only remaining duty was to answer the main telephone line—amounting to a few hours of work per week. Her previous tasks were mostly reassigned to a male college intern. In September 2003, Demoret's employment was terminated by the Mayor after discussing the termination with the Administrator. The termination, accord-

ing to Defendants, stemmed from Demoret's mishandling of legal communications. Demoret elected for COBRA coverage, which was cancelled by the Village but then reinstated.

Taking her facts in the most favorable light, Demoret's removal of job responsibilities, relocation to a lesser office, different and mostly negative interactions with Defendants, and ultimate termination do establish adverse employment actions. Defendants argue that "Demoret's claims regarding diminished responsibilities are based in large part on her personal feeling that she should have the opportunity to advance beyond a secretarial position," and contend that the Administrator's failure to assign Demoret additional projects or inquire regarding her goals and aspirations does not meet the requirements of adverse employment action. Although Defendants admit she moved offices because of the litigation, they contend it was necessary after she allegedly interrupted a meeting between the Administrator and his counsel for this litigation. Defendants' reasoning is rejected. Demoret's termination is an adverse employment action. These actions in the absence of Demoret making an internal complaint, filing an EEOC charge, and filing the instant suit might constitute more inconvenience, alteration of job responsibilities, and rightful termination than adverse employment actions.

 I must now determine whether the adverse actions were causally connected to her protected activities. The instant action was filed on March 19, 2003. Demoret was subsequently moved out of her office on May 9, 2003 and soon after lost most of her job responsibilities. She was terminated on September 17, 2003. Defendants admit the move was connected to the suit and offer a non-retaliatory reason for the relocation. A causal connection, however, "can be established indirectly by

showing that the protected activity was closely followed in time by the adverse action." *Manoharan,* 842 F.2d at 593. Six months passed between the filing and the termination. This Court has found six months to be suggestive of a causal relationship, see *Suggs v. Port Auth. of N.Y. & N.J.,* 1999 WL 269905, at *6, 1999 U.S. Dist. LEXIS 6319 (S.D.N.Y. May 4, 1999) (six months between filing EEOC complaint and firing suggests causal relationship), and also not suggestive of a causal relationship, see *Diaz v. Weill Med. College,* No. 02 Civ. 7380, 2004 WL 285947, at *22 n. 31, 2004 U.S. Dist. LEXIS 2054, at *22 n. 31 (S.D.N.Y.2004) (finding no causation where six months elapsed between plaintiff's complaint and her termination) and *Lichtenstein v. Triarc Cos.,* 2004 WL 1087263, 2004 U.S. Dist. LEXIS 8610 (S.D.N.Y.2004) ("[W]hile proximity in time between the complaint and the adverse employment action may provide circumstantial evidence of retaliation, a hiatus of six months is generally too great to support the inference."). I find that the six months between the filing of the instant lawsuit and the termination is sufficiently suggestive of a causal relationship. A series of adverse employment actions took place after the filing culminating in the termination. Therefore, Demoret's retaliation claims have been established.

## IV. Conclusion

Based on the foregoing, Defendants are not entitled to qualified immunity on Plaintiffs' hostile work environment claims, Pell's disparate treatment claims, and Plaintiffs' retaliation claims. In determining whether Defendants are entitled to qualified immunity on Demoret's remaining claim of disparate treatment, the Court found her claims insufficient and hereby dismisses it. Accordingly, Defendants' motions for summary judgment are hereby granted in part and denied in part.

IT IS SO ORDERED.