Theresa A. DEMORET, Barbara A. Napoli and Robin A. Pell, Plaintiffs–Appellees,

v.

Philip ZEGARELLI, Dwight Douglas and The Village of Sleepy Hollow, New York, Defendants–Appellants.

Docket No. 05–1831–cv.

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 2005.

Decided June 8, 2006.

**144**

Terence M. O'Neil, Garden City, New York (James P. Clark, Bond, Schoeneck & King, PLLC, Garden City, NY, of counsel), for Defendants–Appellants Philip Zegarelli and the Village of Sleepy Hollow.

Jack Babchik, White Plains, New York (Babchik & Young, LLP, White Plains, NY, of counsel), for Defendant–Appellant Dwight Douglas.

Jane Gould, White Plains, New York (Kim Berg, Lovett & Gould, LLP, White Plains, NY, of counsel), for Plaintiffs–Appellees.

Before: CARDAMONE, POOLER, and SOTOMAYOR, Circuit Judges.

CARDAMONE, Circuit Judge:

The case before us on this appeal has as one of the named defendants the Village of Sleepy Hollow (Village), a small municipality located on the banks of the Hudson River in Westchester County, New York. The very name Sleepy Hollow evokes shades of the Headless Horseman, Ichabod Crane, and Katrina Van Tassel—all fictional figures made famous by Washington Irving in *The Legend of Sleepy Hollow* (Wildside Press 2004) (1917). According to the legend, the Headless Horseman haunts this tranquil village. Its ghost is reportedly responsible for numerous frightful encounters, including one in which the specter scared the schoolmaster, Ichabod Crane, out of town. In this case we do not deal with a headless horseman, but with discord of another kind—the alleged discriminatory treatment faced by plaintiffs, two female employees of the Village.

Plaintiffs Theresa Demoret and Robin Pell, employed by the Village of Sleepy Hollow since 1997 and 1998, respectively, sued the Village, Mayor Philip Zegarelli (Zegarelli or Mayor), and Village Administrator Dwight Douglas (Douglas or Administrator) for gender discrimination, asserting claims pursuant to 42 U.S.C. § 1983 for violation of their rights under the Equal Protection Clause of the Fourteenth Amendment; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et *seq.;* and New York State Executive Law § 296. Plaintiffs claimed they were exposed to a hostile work environment, disparate treatment because of their gender, and retaliation for their complaints of discrimination.

Defendants Zegarelli and Douglas moved for summary judgment based on qualified immunity on the § 1983 claims.

The United States District Court for the Southern District of New York (Robinson, J.), granted in part, and denied in part, their motion in an order dated March 4, 2005. *Demoret v. Zegarelli*, 361 F.Supp.2d 193, 205 (S.D.N.Y.2005). From this order defendants appeal. In addition, defendants and the Village ask us to exercise pendent appellate jurisdiction to dismiss plaintiffs' related state law and Title VII claims.

## BACKGROUND

Philip Zegarelli served as Mayor of the Village from 1979 to 1987 and then again during the relevant time period; reelected in 1999, he serves presently. Being Mayor of Sleepy Hollow is a part-time job. As Mayor, Zegarelli is a voting member of the seven-member Village Board and is responsible for its personnel practices, including hiring, firing, and disciplinary matters. The Mayor also directly supervises the Village Administrator. The Village Administrator makes recommendations to the Mayor on personnel decisions and is responsible for the Village's day-to-day operations. In May 2000 Mayor Zegarelli hired Dwight Douglas to serve in that capacity. Douglas's duties included the direct supervision of plaintiffs and the Village department heads.

Plaintiff Demoret was the secretary/assistant to the Mayor and to the Administrator for six years from August 1997 to September 2003. Plaintiff Pell is the Village recreation supervisor, taking that position in 1998 and serving through the present time. Plaintiffs brought suit against the defendants on March 19, 2003. A third plaintiff, Barbara Napoli, joined the original complaint but, by stipulation and agreement with defendants, discontinued it. Plaintiffs Demoret and Pell filed an amended complaint on October 16, 2003. Accepting plaintiffs' allegations and

drawing all permissible inferences in their favor, we set forth the factual background.

### A. *Demoret's Claims*

Theresa Demoret's duties initially included answering the telephone, faxing documents, and drafting letters. During the three years she was employed by the Village prior to Douglas's hire as Village Administrator in May 2000, Demoret worked without much direct supervision, reporting to the acting administrator and the part-time Mayor as necessary. In addition to her duties as secretary/assistant, she took on special projects from time to time. For example, in 1998 she began assisting the treasurer with preparing the payroll.

When Douglas became the Village Administrator, he told Demoret he objected to her working on the payroll because he needed a full-time assistant. When Demoret continued her assistance on the payroll, Douglas checked frequently at her desk to see if she was accomplishing her other duties for him. One of Demoret's charges is Douglas acted condescendingly toward her by closely supervising her work.

She also asserts Douglas treated her rudely throughout the time they worked together—in failing to say good morning to her or engage her in conversation, and that when he did speak he was condescending. At the same time, Demoret asserts that she observed Douglas treating male colleagues in a friendly manner and with courtesy. According to Demoret, Douglas micromanaged the assignments he gave her. For example, he asked her to double check the spelling of another employee's name even after she assured him the spelling was correct, wrote unnecessarily detailed notes to her about assignments she had performed in the past, and accused her of reading the newspaper in-

stead of working when she clipped newspaper articles mentioning Sleepy Hollow as part of her job duties. Further, Demoret complains defendants failed to give her meaningful or enough work to do. Douglas relegated to her basic tasks such as typing, photocopying, and answering the telephone. He delegated substantive projects, such as assisting with park renovation plans, to a male college student intern, while relying on Demoret only for administrative work.

When Demoret complained to Mayor Zegarelli about Douglas's treatment of her and other women in the office, Zegarelli replied by telling Demoret that others had also complained about the Village Administrator because of Douglas's difficult personality. The Mayor promised to talk to Douglas and to try to resolve the personality conflict. To Demoret's knowledge, the Mayor never took such remedial action.

Demoret also contends the Mayor gradually removed meaningful job duties and responsibilities from her, including editing the Village's newsletter, preparing payroll, and using the mayoral stamp. Custody of the mayoral stamp was given to the Village clerk (a female). In addition, the Mayor hired a woman whom he knew from his prior work in the private sector to serve as deputy clerk, and he gave her some duties previously assigned to plaintiff. Without these duties, Demoret complains she was left with little to do. Further, she laments, the Mayor and Village Administrator moved her workspace from the second floor to the third floor of the Village office building after she filed the present lawsuit, and they took from her still more duties at that time.

Through discovery conducted in this litigation, the Village learned that Demoret had engaged in the unauthorized disclosure of Village documents to her attorneys, who were involved with other litigation

against the Village. The Village held a hearing on September 3, 2003 to allow Demoret to respond to the allegations. Thereafter, Mayor Zegarelli announced his decision to fire Demoret, which the Village Board of Trustees approved by resolution on October 14, 2003.

## B. *Pell's Claims*

Robin Pell took the job as recreation supervisor having previously worked for the Village, running the day camp in the summer of 1998 and managing the fall festival. In 1998 she received a provisional appointment to the position of recreation supervisor. The Village made that appointment permanent in 2000 after Pell passed a qualifying civil service test.

Pell, like Demoret, contends that as an employee she was subjected to a hostile work environment and disparate treatment on the basis of her gender. Pell's hostile work environment claims are similar to those of Demoret. She declares that Douglas spoke to her in a condescending manner and did not extend social pleasantries, such as saying hello or good morning, that he offered to male colleagues. On one occasion at a Village function, Douglas commented to her in front of two other town employees that she looked nice "and that [she] should dress that way more often, because when [she] wear[s] a sweatsuit [her] IQ must drop 20 points." Also, according to Pell, Douglas accused her of being insubordinate when she expressed disagreement with him. Pell contends that the Administrator used a different tone of voice to speak to her than the one he used to speak to male colleagues at the department head meetings. When Pell complained to him that he did not treat her the same as male department heads, Douglas accused her of being "too emotional."

As part of her hostile work environment claim, Pell points to Zegarelli's and Douglas's comments regarding a sexual harassment seminar for Village employees. According to Pell, Mayor Zegarelli said that the seminar would be pointless for some Village employees. He permitted jokes about the seminar during a department head meeting, and he joked about the amount of litigation against the Village. Village Administrator Douglas commented that the Village was holding the seminar because "women do foolish things." Pell found these comments offensive.

Like Demoret, Pell also asserts that Douglas micromanaged her assignments and harassed her. In support of this contention, Pell points to Douglas's reviewing assignments with her in a detailed manner and giving her lists of tasks to complete. She also contends that the Administrator scrutinized her department's budget and expenditures more than he examined the budgets of other departments that were run by male department heads.

Pell cites various office moves as evidence of gender discrimination. In March 1999 she was moved from an office with windows to an adjacent windowless office. Pell maintains further that she was treated differently from the male department heads, especially with respect to pay issues. She declares she was paid a lower salary than male employees of the Village at her level. In fact, she says, she was even paid less than two of her male subordinates. Pell's starting salary as recreation supervisor was $40,000, but her male predecessors, one of whom held the position for only two months, each made $48,000. She charges the pay inequity was a result of gender discrimination.

In addition to her duties as recreation supervisor, Pell took on the job of running the Village's day camp instead of hiring a separate day camp director. The Mayor promised her a stipend as compensation for the extra responsibility, but the Village never paid her for this work. According to Pell, her male counterparts—the other department heads—regularly received stipends or extra money for performing duties beyond their regular roles.

Pell also contends that she was not allowed to accumulate comp time or overtime pay. Douglas required her to submit her work schedule to him in advance, and he would instruct her to take off more time from work so that she did not accumulate overtime. The Administrator accused Pell of taking overtime without permission and threatened her with disciplinary charges for unauthorized overtime. Although she was not in fact charged, Douglas's scrutiny limited her ability to earn overtime by working evenings and weekends. Douglas did not similarly require male department heads to scale back their hours or to limit their overtime. The male department heads were permitted to supplement their base salaries substantially, which were already higher than Pell's salary, by earning overtime.

Pell declares she was eligible for a promotion and pay increase for passing the civil service test for superintendents, but the Village declined to change her job title to recreation superintendent even after she qualified for that position. That title was held by at least one of her male predecessors. Pell reasons that it was discriminatory for the Village to refuse to change her title to superintendent because she was doing the job of her predecessors and providing more services than they did.

### C. *Prior Legal Proceedings*

Defendants moved for summary judgment based on qualified immunity. On March 4, 2005 the district court denied this motion in part, and granted it in part. *Demoret,* 361 F.Supp.2d at 205. The court

found plaintiffs had alleged sufficient evidence to establish a hostile work environment, *id.* at 200, and therefore denied defendants qualified immunity on this claim, *id.* at 205.

With respect to the disparate treatment claims, the trial court held that Demoret had not shown disparate treatment because she was comparing herself to employees who were not similarly situated. *Id.* at 201. Demoret's disparate treatment claim was accordingly dismissed. *Id.* at 205. At the same time, the district court reasoned, Pell had shown that she was paid less than the similarly situated male department heads as well as her subordinates. *Id.* at 201. For that reason, the trial court held that Pell's disparate treatment claim could go forward, and consequently denied defendants' assertion of qualified immunity. *Id.* at 202, 205.

We now affirm, in part, and reverse and remand, in part.

## DISCUSSION

Ordinarily, we have no jurisdiction to hear an immediate appeal from a district court order denying summary judgment because such an order is not a final decision. *See* 28 U.S.C. § 1291; *O'Bert ex rel. Estate of O'Bert v. Vargo,* 331 F.3d 29, 38 (2d Cir.2003). But, under the collateral order doctrine, the denial of a motion for summary judgment made by a government official based on his claim of qualified immunity is immediately appealable to the extent the district court denied the motion as a matter of law. *Locurto v. Safir,* 264 F.3d 154, 162 (2d Cir.2001).

We review de *novo* a district court's denial of summary judgment when the motion for such relief is made on qualified immunity grounds. *Moore v. Vega,* 371 F.3d 110, 114 (2d Cir.2004). We construe the facts in the light most favorable to the non-moving party, here plaintiffs Demoret and Pell. *Zurich Am. Ins. Co. v. ABM Indus., Inc.,* 397 F.3d 158, 164 (2d Cir.2005). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### I Qualified Immunity

Qualified immunity protects government officials from civil liability when performing discretionary duties "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In deciding whether qualified immunity applies, the threshold inquiry is whether the plaintiff's version of the facts "show[s] the officer's conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *accord Moore,* 371 F.3d at 114. If no constitutional or statutory right was violated—construing the facts in favor of plaintiffs—we need not conduct further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

If on the other hand, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* A defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law. *Ford v. Moore,* 237 F.3d 156, 162 (2d Cir.2001). In other words, government officials will be immune from liability if they can establish that it was objectively reasonable for them

to believe their actions were lawful at the time. *Moore*, 371 F.3d at 114.

## II Section 1983 Claims

Plaintiffs brought equal protection claims against the Mayor and Village Administrator under 42 U.S.C. § 1983 alleging violations of their Fourteenth Amendment rights to be free from discrimination. Section 1983 allows an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

Having discussed the framework for deciding an issue of qualified immunity, we turn to the threshold question in this case: whether, on the facts alleged, Mayor Zegarelli and Village Administrator Douglas could be found to have violated plaintiffs' equal protection rights.

We have held that sex-based discrimination may be actionable under § 1983 as a violation of equal protection. *See Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir.1996). Accordingly, § 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including hostile work environment and disparate treatment, on the basis of gender. Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals. *See Feingold v. New York*, 366 F.3d 138, 159 & n. 20 (2d Cir.2004) (reasoning that § 1983 equal protection claims parallel Title VII claims); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir.2004) (applying *McDonnell Douglas* framework to § 1983 case).

### A. Hostile Work Environment

In order to establish a claim of hostile work environment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000). Plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir.2003).

Isolated incidents typically do not rise to the level of a hostile work environment unless they are "of sufficient severity" to "alter the terms and conditions of employment as to create such an environment." *Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir.2004). Generally, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir.2002).

To analyze a hostile work environment claim, we look to the record as a whole and assess the totality of the circumstances, *see Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir.2001), considering a variety of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris*, 510 U.S. at 23, 114 S.Ct. 367. We must also consider the extent to which the

conduct occurred because of plaintiffs' sex. *See Alfano,* 294 F.3d at 374.

 There is little, if any, evidence to suggest that Douglas's close monitoring of Demoret's work, his mild rudeness to her, or his failure to take advantage of all of her abilities was motivated by gender discrimination. Likewise, there is little evidence that the Administrator was discriminating against Demoret on account of her sex when he assigned responsibilities formerly handled by her, such as maintaining custody of the mayoral stamp, to other female employees. Further, this treatment was not so severe as to be abusive.

After plaintiffs filed their lawsuit, Demoret was moved to the third floor of the Village office building, and various duties, especially those that were confidential in nature, were taken from her. For a portion of the time she was on the third floor, either her computer or her printer was not functioning. In the end, Demoret was fired. There is no indication that male employees were or would have been treated differently under similar circumstances.

Pell's complaints of a hostile work environment fail for similar reasons—the incidents she alleges are insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment. To support her hostile work environment claim, Pell points to, *inter alia,* Douglas's reviewing her budget with a fine-toothed comb and his criticizing her for being five minutes late to department meetings even though male employees could skip meetings with impunity. The evidence that Pell presents as part of her hostile work environment claim may go to the existence of an adverse employment action with respect to her disparate treatment claim, which we discuss below, but it does not rise to the level of a hostile work environment. There is nothing in the record to indicate that the environment faced by Pell was so severe as to be abusive.

As a consequence, we conclude that neither Demoret nor Pell has presented evidence that would allow a reasonable factfinder to believe defendants Douglas and Zegarelli exposed them to a hostile work environment. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367. Therefore, defendants are entitled to qualified immunity on plaintiffs' hostile work environment claims, and the district court's contrary view must be reversed as to both plaintiffs.

### B. *Disparate Treatment*

We turn to plaintiffs' claims that they were denied their equal protection right to be free from gender discrimination because they were treated differently than similarly situated male employees of the Village. Before addressing Pell's claims, we note that we are not called upon to assess defendants' qualified immunity with respect to Demoret's claims. We read the district court's opinion to have dismissed all of Demoret's disparate treatment claims, and she has not cross-appealed that ruling. *See Demoret,* 361 F.Supp.2d at 205 ("In determining whether Defendants are entitled to qualified immunity on Demoret's remaining claim of disparate treatment, the Court found her *claims* insufficient and hereby dismisses it[sic]." (emphasis added)).

 To the extent the district court's dismissal of Demoret's disparate treatment claim is ambiguous and can be read as dismissing only her salary claim, *see Demoret,* 361 F.Supp.2d at 201 (discussing salary), and thus allowing the claim that her office move and firing were motivated by discrimination to survive, we hold that even when viewed in the light most favorable to plaintiff, there is no evidence from which a reasonable factfinder could con-

clude that defendants were motivated by gender in moving Demoret's office or in firing her. Therefore, defendants are entitled to qualified immunity on these claims.

■ Turning now to Pell's claims of unequal treatment. Courts analyze claims of disparate treatment under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir.2001). The plaintiff must first establish a *prima facie* case by demonstrating that: (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

■ If the plaintiff demonstrates a *prima facie* case, the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action. *Id.* at 802–04, 93 S.Ct. 1817. If the defendant makes such a showing, the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual. *Id.* at 804, 93 S.Ct. 1817.

In this case, defendants do not dispute that Pell is a member of a protected class or that she performed her job duties satisfactorily; hence prongs one and two of Pell's *prima facie* case of disparate treatment are satisfied.

■ For the third prong, Pell must show that she suffered adverse employment action. An adverse employment action is a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir.2005). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.*

Some of the actions about which Pell complains were not adverse employment actions. She cannot premise a claim on her various office moves. Defendants were not employed by the Village when the first move occurred, and her newest office was in her view better than the office she occupied when Zegarelli became Mayor. Nor can she premise a claim on the fact that the Village assigned her a Jeep to use instead of a Ford.

■ Other allegations, however, more comfortably satisfy the third prong's requirement of an adverse employment action. Pell alleges she was paid considerably less than other department heads, all of whom were male. She was paid less than her predecessors even though she took on more responsibility than they had. She was even paid less than subordinate male employees that she supervised. Pell alleges also that, beginning in 2002, she was not allowed to earn overtime pay or comp time and that she was the only employee required to submit written requests to work overtime.

Defendants' failure to promote Pell to superintendent and the transfer of her employees to another department, which are relevant to her wage claim, may also constitute adverse employment actions. At least one of her predecessors held the title of superintendent, and Zegarelli and Douglas moved quickly to give the title to another male department head around the same time that Pell was denied the title. Further, the transfer of her employees

constitutes "significantly diminished material responsibilities." *Fairbrother*, 412 F.3d at 56. Pell's allegations regarding her pay, lack of promotion, and removal of supervisory responsibilities form sufficient showings of adverse employment action to persuade us that Pell meets the third prong of establishing her *prima facie* case on these claims.

■ She is also able to establish the fourth prong because circumstances surrounding the adverse employment actions experienced by plaintiff give rise to an inference of gender discrimination. These actions must be seen in the context of Douglas's micromanaging and offensive comments and Zegarelli's failure to respond to her expressed concerns. As discussed above, although the treatment complained about by plaintiffs does not rise to the level of a hostile work environment, it does support Pell's claim of disparate treatment on the basis of gender.

■ Defendants argue that the actions about which Pell complains were the results of nondiscriminatory managerial decisions, including budget concerns. However, Pell has proffered sufficient evidence that male department heads were given raises and allowed more leeway regarding spending during the relevant time period, and a factfinder could reasonably conclude that Zegarelli and Douglas's managerial reasons were pretextual and that the real reason was discrimination. *See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 317 (2d Cir.1999).

Thus, the district court properly determined that Zegarelli and Douglas were not entitled to qualified immunity on Pell's equal protection claims.

### III Pendent Appellate Jurisdiction

■ In considering this interlocutory appeal, we may exercise pendent jurisdiction over issues that are not otherwise appealable, but only to the extent that (1) those issues are "inextricably intertwined" with the question of qualified immunity, or (2) review of those issues is necessary for meaningful review of the qualified immunity claim. *See Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 757–58 (2d Cir.1998) (citing *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995)).

■ As illustrated by our discussion of the qualified immunity issue, the merits of a constitutional claim generally are inextricably intertwined with qualified immunity because we must determine whether a constitutional right has been violated before deciding whether the right was clearly established. *See Kaluczky v. City of White Plains*, 57 F.3d 202, 207 (2d Cir. 1995). Where the standards for finding a violation under other statutes are the same as those for finding a constitutional violation under § 1983, and we premise a finding of qualified immunity on the fact that no individual defendant violated the plaintiff's constitutional rights, liability under statutes other than § 1983 also tends to be inextricably intertwined with the qualified immunity question. Finally, where a municipality's liability arises solely from the actions of an employee who is entitled to qualified immunity, we may, in our discretion, reach the liability of the municipality under the doctrine of pendent appellate jurisdiction. *See Sadallah v. City of Utica*, 383 F.3d 34, 39 (2d Cir.2004).

### A. State Law Claims for Hostile Work Environment

■ Plaintiffs asserted hostile work environment claims under New York state law in addition to their federal claims. The standard of liability for these claims is the same as for the federal claims. *Cf. Ferraro v. Kellwood Co.*, 440 F.3d 96, 99

(2d Cir.2006). Hence, we exercise jurisdiction over these claims. *See Sadallah,* 383 F.3d at 39 (finding claim "inextricably intertwined" where it was "based on precisely the same argument that we rejected in finding for [defendant] on the qualified immunity issue"). Because we hold that plaintiffs have not established that Zegarelli and Douglas violated their equal protection rights to an unhostile work environment, and that therefore defendants are entitled to qualified immunity on the federal claims, it follows that plaintiffs have not established a hostile work environment claim under New York State Human Rights Law, N.Y. Exec. Law § 296. *See Forrest v. Jewish Guild for Blind,* 3 N.Y.3d 295, 305, 310–11, 786 N.Y.S.2d 382, 819 N.E.2d 998 (N.Y.2004) (applying standard for state law claim of hostile work environment, an identical standard as that under federal law). Defendants are also entitled to summary judgment on the plaintiffs' state law claims for hostile work environment.

We also exercise pendent appellate jurisdiction over the hostile work environment claims that plaintiffs brought under New York state law against the Village. Plaintiffs' allegations that the Village is liable for a hostile work environment are based solely on the acts of Zegarelli and Douglas. Plaintiffs' claims against the Village are thus inextricably intertwined with their claims against the individual defendants. Because we have found as a matter of law that Zegarelli and Douglas did not subject plaintiffs to a hostile work environment, defendants are entitled to summary judgment on plaintiffs' parallel state law causes of action.

### B. *Title VII and State Law Claims for Disparate Treatment*

■ Likewise, we exercise pendent appellate jurisdiction over the district court's denial of defendants' motion for summary judgment on plaintiffs' disparate treatment claims under Title VII, against the Village, and under state law, against all defendants.

Title VII claims for disparate treatment parallel the equal protection claims brought under § 1983. *Feingold,* 366 F.3d at 159. "The elements of one are generally the same as the elements of the other and the two must stand or fall together." *Id.* The standards for deciding the state law claims for disparate treatment are also the same as the standards for § 1983 and Title VII. *Ferraro,* 440 F.3d at 99. Having determined that the district court correctly dismissed all of Demoret's disparate treatment claims, we dismiss her Title VII and state law claims against the individual defendants and the Village.

As for Pell's Title VII and state law disparate treatment claims against Zegarelli, Douglas, and the Village, we dismiss those claims not premised on the inequities Pell experienced with regard to salary, overtime, and supervisory duties, such as the claims involving the car and Pell's office moves. Pell may continue however to pursue under Title VII and state law, as she may under § 1983, her claims that she was paid a lower salary than her male colleagues and subordinates, prevented the opportunity for promotion, denied the opportunity to earn overtime, and stripped of her supervisory responsibilities because she was a woman.

### C. *Title VII and State Law Claims for Retaliation*

■ Plaintiffs also claimed retaliation, under Title VII and New York state law, for their speaking out against the alleged discrimination they experienced. Because we may readily decide the 42 U.S.C. § 1983 issues—whether defendants Zegarelli and

Douglas created a hostile work environment or otherwise discriminated against plaintiffs on the basis of sex—without considering whether defendants retaliated against plaintiffs for complaining about discrimination, we hold that plaintiffs' retaliation claims are not inextricably intertwined with their § 1983 claims in this case. Cf. *Rein,* 162 F.3d at 759. Thus, we lack pendent jurisdiction over them.

## CONCLUSION

Accordingly, the district court's denial of summary judgment based on qualified immunity to defendants is affirmed, in part, and reversed and remanded, in part. Zegarelli and Douglas are entitled to qualified immunity on plaintiffs' hostile work environment claims. The parallel hostile work environment claims against the Village are dismissed. We have read the district court's opinion as dismissing all of Demoret's § 1983 disparate treatment claims, and we dismiss her Title VII and state law disparate treatment claims as well. Zegarelli and Douglas are not entitled to qualified immunity on Pell's claims of disparate treatment regarding her pay, title, and supervisory responsibility, and Pell may proceed against the individual defendants and the Village with those claims under § 1983, Title VII, and state law. Because we lack pendent appellate jurisdiction over plaintiffs' Title VII and state law claims for retaliation, we do not reach these claims on this appeal.