**Sergio DE LA CRUZ, Plaintiff,**

v.

**The CITY OF NEW YORK, Defendant.**

**No. 09 Civ. 4905(FM).**

United States District Court, S.D. New York.

April 7, 2011.

---

Stewart Lee Karlin, Stewart Lee Karlin, Attorney-At-Law, New York, NY, for Plaintiff.

Danielle Barrett, NYC Law Department, Office of The Corporation Counsel, New York, NY, for Defendant.

### MEMORANDUM DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

#### I. Introduction

Plaintiff Sergio De la Cruz ("De la Cruz"), an employee of the Administration for Children's Services ("ACS") of the City of New York ("City"), brings this action alleging that the City discriminated against him on the basis of his age and national origin, and later retaliated against him.[1] De la Cruz seeks relief for these purported wrongs under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA").

Following the close of discovery, the City has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 19). For the reasons set forth below, that motion is granted.

#### II. Relevant Facts and Procedural History

Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to De la Cruz.

#### A. Parties

De la Cruz is a forty-eight-year-old Hispanic male who has worked for ACS in various positions since 1988. (Def.'s Stmt. of Undisputed Material Facts Pursuant to

---

1. De la Cruz's complaint also alleges discrimination claims based on his gender and actual or perceived disability. (ECF No. 1

("Compl.") at 2–3). De la Cruz later withdrew these claims, however. (ECF No. 25 ("Pl.'s Mem.") at 3 n. 1).

Local Rule 56.1 ("Def.'s 56.1 Stmt.") ¶¶ 1, 2; Pl.'s Resp. to Def.'s Rule 56.1 Stmt. ("Pl.'s 56.1 Resp. Stmt.") ¶¶ 1, 2). He currently is employed by ACS as a child welfare specialist case worker, a position he has held since September 2009. (Decl. of Danielle J. Barrett, dated July 23, 2010 ("Barrett Decl."), Ex. B ("De la Cruz Dep.") at 24). Previously, he was employed as a Performance Monitor in ACS's Agency Program Assistance unit ("APA"). (Def.'s 56.1 Stmt. ¶ 3; Pl.'s 56.1 Resp. Stmt. ¶ 3).

ACS provides services for the City's "most troubled children and families." (*See* Barrett Decl. Ex. C (Decl. of Jess Dannhauser, dated July 23, 2010 ("Dannhauser Decl.")) ¶ 31). Some of these services are contracted out to private agencies ("provider agencies") throughout the City, which, in turn, are monitored by APA. (*Id.* ¶ 2). In 2007, when De la Cruz began working in the APA unit, Jess Dannhauser ("Dannhauser") was the Assistant Commissioner of APA, responsible for overseeing the entire unit.[2] (*Id.*). During De la Cruz's tenure, the APA unit consisted of ten teams of Performance Monitors. (*Id.* ¶ 3). The teams typically consisted of four, but sometimes had only three, Performance Monitors. (Barrett Decl. Ex. D (Decl. of Pearlene Telford, dated July 23, 2010 ("Telford Decl.")) 15; Ex. F (Decl. of Luisa Linares, dated July 23, 2010 ("Linares Decl.")) ¶ 5).

Initially, the APA unit supervisory structure called for each team of Performance Monitors to report directly to a supervisor, who reported to a deputy director, who, in turn, reported to a director. (Dannhauser Decl. ¶ 4). At some point, pursuant to a reorganization, the team supervisors began reporting to the director for their department, bypassing the deputy

director. At all relevant times, the APA directors reported to Assistant Commissioner Dannhauser. (*Id.* ¶¶ 4–5).

### B. *Performance Monitors*

The APA Performance Monitors were responsible for "(i) maintaining contact as a direct liaison between the provider agenc[ies] and APA; (ii) monitoring the programmatic operations of the provider agencies by reviewing those operations; and (iii) making sure that [the provider agencies] adhere[d] to all contract provisions and the rules and regulations governing the services they provide." (Def.'s 56.1 Stmt. ¶ 18). To fulfill these responsibilities, Performance Monitors made frequent visits to the provider agencies' sites and gave them feedback and recommendations. (*Id.* ¶ 19; *see* Barrett Decl. Ex. H (De la Cruz's tasks and standards form)). ACS required that Performance Monitors know how to collect quantitative data about the provider agencies' services, conduct statistical analyses of that data using computer software, and relay those results effectively to the provider agencies. (Def.'s 56.1 Stmt. ¶ 20; Pl.'s 56.1 Resp. Stmt. ¶ 20).

### C. *De la Cruz's Promotion to Performance Monitor*

In 1988, ACS hired De la Cruz as a case worker for its Queens office. (De la Cruz Dep. 27). Thereafter, he received several promotions, culminating in his permanent appointment as a Child Welfare Specialist Supervisor, Level I. (*See id.* at 27–28, 99; Barrett Decl. Ex. V).

In June or July 2007, after interviewing De la Cruz, Dannhauser recommended that he be hired as an APA Performance Monitor. (Dannhauser Decl. ¶ 9). In August 2007, ACS informed De la Cruz that

---

**2.** Dannhauser self-identifies as a white male born in the United States in 1978. (*Id.* ¶ 63).

His name is misspelled in the transcript of the De la Cruz deposition as "Danhousen."

he had been "provisionally promoted to the title of Supervisor III to work in [APA] as a Performance Monitor," effective July 23, 2007. (Def.'s 56.1 Stmt. ¶ 3; Pl.'s 56.1 Resp. Stmt. ¶ 3; Barrett Decl. Ex. U). The appointment was provisional because De la Cruz did not earn his promotion through a civil service exam. (De la Cruz Dep. 28–29).

### D. De la Cruz's Performance on Team Two

In August 2007, after De la Cruz was provisionally hired as a Performance Monitor, Dannhauser assigned him to Team Two, which was supervised by Pearlene Telford ("Telford").[3] (Dannhauser Decl. ¶ 10). The other Performance Monitors on Team Two were Christian Tirado ("Tirado"), Karen Rivera ("Rivera"), and Moira Flavin ("Flavin").[4] (Def.'s 56.1 Stmt. ¶ 8; Pl.'s 56.1 Resp. Stmt. ¶ 8).

In August 2007, all APA Performance Monitors, including De la Cruz, attended several required days of training. (Def.'s 56.1 Stmt. ¶¶ 15–16; Pl.'s 56.1 Resp. Stmt. ¶¶ 15–16; Barrett Decl. Ex. E). The training topics included an overview of the child welfare system, team building, cultural competency, youth development, safety and risk, writing, engagement and interviewing skills, and coaching and feedback. (Barrett Decl. Ex. E). Telford contends that, during the training sessions, she "began to develop concerns about [De

la Cruz's] performance" because he showed disinterest and "fail[ed] to grasp the functions of his job." (Telford Decl. ¶ 8; Def.'s 56.1 Stmt. ¶ 21). Indeed, according to Telford, De la Cruz appeared "not to be listening" and "about to fall asleep." (Telford Decl. ¶ 8; Barrett Decl. Ex. I. at 2). De la Cruz admits that he found the training sessions to be "tedious and repetitive," but denies that he ever fell asleep. (Pl.'s 56.1 Resp. Stmt. ¶ 22).

Telford found that, despite extra supervision, De la Cruz's work as a Performance Monitor was poor. (Telford Decl. ¶ 16). De la Cruz often expressed "anxiety about performing the functions of his position." Telford advised him to prepare his work thoroughly and personally provided him with additional training. (Id. ¶¶ 13–15; Barrett Decl. Ex. I at 1). Nevertheless, she found that he "continually fail[ed] to fulfill the requirements of his job" and was "uncooperative" when working with teammates. (Barrett Decl. Ex. I at 1).

In October 2007, on at least two separate occasions, De la Cruz fell asleep during site visits to the provider agencies' offices.[5] (Telford Decl. ¶¶ 17–19; Barrett Decl. Ex. I at 2). Telford informed De la Cruz that "his conduct was unacceptable and could not be repeated." (Telford Decl. ¶ 20). Around this time, Telford also became aware that De la Cruz held a non-ACS job in New Jersey; she suggested that he budget his time so that he could

---

**3.** Telford self-identifies as a black female born in Guyana in 1966. (Telford Decl. ¶ 42).

**4.** "Tirado is a Hispanic male, under the age of 40.... Rivera is a Hispanic female, under the age of 40.... Flavin is a white female, under the age of 40." (Def.'s 56.1 Stmt. ¶¶ 9–11; Pl.'s 56.1 Resp. Stmt. ¶¶ 9–11). Tirado's name is misspelled in the transcript of the De la Cruz deposition as "Tiradio."

**5.** In his response to Defendant's Rule 56.1 Statement, De la Cruz denies that he fell

asleep at providers' sites. (Pl.'s 56.1 Resp. Stmt. ¶¶ 25, 26, 28). However, the Supplemental Declaration ("Pl.'s Suppl. Decl.") that he cites as support for his position is silent on this topic. (Id. (citing Pl.'s Suppl. Decl. ¶¶ 22, 25, 26, 28)). Indeed, the only statement De la Cruz makes under penalty of perjury is that, contrary to ACS "policy," "Telford never cited [him] in any form (verbal or written) for such repeated violations." (Pl.'s Suppl. Decl. ¶ 22).

perform properly as a Performance Monitor. (*Id.* ¶ 21).

On October 12, 2007, APA Deputy Director Toni Cardenas ("Cardenas") assigned De la Cruz to attend a meeting with two provider agencies. (Barrett Decl. Ex. I at 2). Returning home from this meeting on October 15, De la Cruz fell down the train station stairs, injuring himself. (Decl. of Sergio De la Cruz, dated Sept. 22, 2010 ("De la Cruz Decl.") ¶ 26). The emergency room doctor who treated him that evening found no broken bones, but recommended that De la Cruz follow up with his primary care physician. Despite that recommendation, De la Cruz went to work on October 16, 17, and 18, 2007, "as if nothing had happened." (*Id.*). On October 18, he showed his injuries to Cardenas and another ACS staff member. They instructed him to inform his supervisors that he was injured and to go to the nearest emergency room. He was admitted to the hospital for approximately one week, but did not return to work until November 5, 2007. (*Id.*). De la Cruz eventually filed a Workers' Compensation claim in connection with this injury. As of March 2010, that claim remained open. (*See* De la Cruz Dep. 21).

On November 9, 2007, Telford held a team meeting to discuss Team Two's provider agency reviews ("November 9 Meeting"). (De la Cruz Decl. ¶ 31). After several of De la Cruz's teammates presented their reviews, but before he presented, the meeting took a "sinister turn." Telford changed the topic and invited team members to "freely express[ ]" their opinions about De la Cruz. In response, Flavin, who was a fellow Team Two Performance Monitor, "questioned the validity and truthfulness of [De la Cruz's] reported accident and injuries." In a "hostile and rude" manner, she called him a "liar" and accused him of lying about his accident in the

train station on October 15. Flavin concluded by saying, "I'm done. I can't handle this any more. They are all the same." (*Id.* ¶¶ 31–32).

After other teammates spoke, Telford took the floor. (*Id.* ¶ 32). On a large board, she wrote "dysfunctional." She then said that De la Cruz constituted twenty percent of the team but was responsible for eighty percent of its problems. She cautioned De la Cruz that "they" were going to watch his "every step" and that this was "a very unfortunate situation to be in." In the course of this diatribe, Telford also noted, "I worked in Corrections. I know the behavior." (*Id.*).

On November 13, 2007, during a site visit to a provider agency, Telford and De la Cruz had a verbal altercation, the details of which are disputed. Telford alleges that she asked De la Cruz to copy her on all of his outgoing email, after which "[h]e became unreasonably and frighten[ingly] angry," yelling at her loudly in front of APA teammates. (Barrett Deck Ex. I at 3). De la Cruz disputes this account. He contends that Telford "harass[ed]" him by making threatening and demeaning statements while sitting increasingly close to him. (Pl.'s 56.1 Resp. Stmt. ¶ 35).

After the incident at the provider agency's site, Telford felt that she "could no longer supervise" De la Cruz because his "threatening demeanor" caused her to fear for her "physical and mental well being." (Telford Decl. ¶ 38). She also requested that Cardenas sit in on all of her meetings with De la Cruz. (*Id.* ¶¶ 38–39). Although Telford reported her concerns regarding De la Cruz to Dannhauser and other supervisors, the other two Hispanic employees on Team Two continued to report to her. (*Id.* ¶¶ 40, 44; Barrett Deck Ex. I).

At some unspecified time during De la Cruz's tenure on Team Two, Flavin and Telford decided to close down two programs operated by Alianza Dominicana, a Hispanic provider agency that De la Cruz oversaw. Flavin and Telford reached this decision after Alianza Dominicana was placed on probation a few months earlier. Despite De la Cruz's "attempts to assist the agency," and his entreaties to Telford to keep the programs open, Telford transferred Alianza Dominicana's cases to two non-Hispanic provider agencies. (De la Cruz Decl. ¶ 22).

### E. Events Leading to De la Cruz's Assignment to Team Five

On November 5, 2007, Dannhauser held the first of several meetings with De la Cruz to discuss his job performance, particularly Telford's allegation that he fell asleep during a meeting with a provider agency. During that meeting with Dannhauser, De la Cruz admitted that he had fallen asleep at a provider agency's office. (Dannhauser Decl. ¶ 14). Dannhauser informed De la Cruz that his synthesis of data and agency record reviews were not meeting APA's standards. (Id. ¶ 16; Barrett Decl. Ex. J at 1). However, Dannhauser also indicated at this or another meeting that he was responding to pressure from Telford and recognized that De la Cruz had done "excellent" work in connection with two site visit reports. (De la Cruz Decl. ¶ 33).

A few days after the November 5 meeting, De la Cruz sent Dannhauser and Jacqueline Martin ("Martin"), whom he identified as an APA Deputy Commissioner, a memorandum discussing his experiences with Team Two.[6] (Dannhauser Decl. ¶ 17). In that memorandum, De la Cruz asserted that he had been the subject of "differential treatment" and "illegal harassment." (Barrett Decl. Ex. Q) (memorandum dated Nov. 9, 2007 ("November 9 Memorandum")). Among other things, De la Cruz contended that he had the "largest and most challenging" work load among the Performance Monitors assigned to Team Two, and that Telford had consistently denied him overtime. (Id. at 1–2). Attached to the memorandum was a four-page document entitled, "The Socialized Psychopath or Sociopath," which apparently is unrelated to De la Cruz's employment at APA. (Id. at 6–9). De la Cruz also sent a copy of the November 9 Memorandum to the ACS Equal Employment Opportunity office ("ACS EEO"). (See id. at 5; Dannhauser Decl. ¶ 19). As a result, the ACS EEO requested that Dannhauser keep it "informed of any related issues or decisions made regarding" De la Cruz's allegations. (Dannhauser Decl. ¶ 20).

On November 14, 2007, Dannhauser and Martin held a meeting with De la Cruz to discuss the allegations in the November 9 Memorandum and his November 13 verbal altercation with Telford. (Id. ¶ 21; Barrett Decl. Ex. J at 1). During the meeting, De la Cruz contended that Telford and his teammates were treating him differently. (Barrett Decl. Ex. J at 1). In response, Dannhauser and Martin stressed that "any unprofessional verbal abuse of Telford was inappropriate." (Dannhauser Decl. ¶ 27). De la Cruz then said that visiting the provider agencies caused him to feel "stressed." (Id. ¶ 28). Since site visits were an important part of De la Cruz's job, Dannhauser became "very con-

---

**6.** Martin was an APA director. She is an African–American woman over the age of forty. (Def.'s 56.1 Stmt. ¶¶ 12–13; Pl.'s 56.1 Resp. Stmt. ¶¶ 12–13). She may have been at the November 5 meeting. (See Barrett Decl. Ex. J at 1 (memorandum from Dannhauser and Martin to file indicating that "we" addressed the issue of De la Cruz falling asleep at a provider's site during the November 5 meeting)).

cerned that he was not performing his job duties and that he might be placing children and families at risk." (*Id.* ¶¶ 29, 32). Dannhauser and Martin therefore restricted De la Cruz to office work until they could reach "an appropriate resolution." (*Id.* ¶ 33; Barrett Decl. Ex. J. at 1).

Dannhauser held separate meetings with Telford and the three other Performance Monitors on Team Two, after which he concluded that "De la Cruz's version of events differ[ed] widely from the version described by his three team members and his supervisor." (Barrett Decl. Ex. J. at 1). Nonetheless, Dannhauser and Martin cautioned Telford and the team members to treat De la Cruz and all colleagues with "the highest degree of professional respect and humanity." (*Id.*).

On November 27, 2007, after discussing the situation with Martin and ACS's general counsel, Dannhauser met with De la Cruz to discuss whether De la Cruz would be willing to "seek alternative employment" in another ACS unit. (*Id.* at 1–2). Dannhauser and Martin did not believe that De la Cruz was a "good match" for the Performance Monitor position, given his stress, numerous incidents of unprofessionalism, and "failure to progress at his job despite training and ample supervision." (Dannhauser Decl. ¶ 35). Dannhauser discussed other employment options, such as assigning De la Cruz to a different APA team or replacing De la Cruz's "traditional Performance Monitor responsibilities with alternative tasks." (*Id.* ¶ 40). Dannhauser instructed De la Cruz to think about these options and to make a decision by the end of that week. (Barrett Decl. Ex. J at 2). De la Cruz, however, called in sick for the rest of the week. (*Id.* Dannhauser Decl. ¶ 41).

The following week, De la Cruz submitted a note from his doctor which recommended that he take more time off from work to "rest and recover from the injuries he had sustained from an on the job accident." (Dannhauser Decl. ¶ 43). In an accompanying note, however, De la Cruz wrote that, despite the recommendation, he would not be taking additional time. (*Id.* ¶ 44).

On December 4, 2007, following the ACS EEO's advice, Dannhauser and Martin met again with De la Cruz. After Dannhauser encouraged De la Cruz to take time off, as his doctor had recommended, De la Cruz reiterated his desire to continue working. (*Id.* ¶¶ 45–47; Barrett Decl. Ex. R at 2). Following up on the discussion at the November 27 meeting, De la Cruz also said that he wanted to remain in the APA unit. (Dannhauser Decl. ¶ 48).

### F. *De la Cruz's Reassignment to Team Five*

In or around January 2008, Dannhauser reassigned De la Cruz from Team Two to Team Five, which was under the supervision of Luisa Linares ("Linares").[7] (*Id.* ¶ 50). Dannhauser maintains that he selected Team Five for two reasons: First, Team Five was relatively understaffed, with three Performance Monitors instead of four; second, Dannhauser was "confident" in Linares' abilities and believed that "she would do everything she could to help [De la Cruz] improve his performance." Dannhauser consequently thought that De la Cruz "stood a good chance at developing [the necessary] skills" by working under Linares. (*Id.* ¶ 51).

De la Cruz disputes Dannhauser's motivation, contending that Team Five already

---

**7.** Linares self-identifies as a Hispanic female born in the Dominican Republic in 1972. (Linares Decl. ¶ 59). Her name is misspelled in the transcript of the De la Cruz deposition as "Lenaris."

had four Performance Monitors and was known to be the weakest team. (Pl's Suppl. Decl. ¶ 43). De la Cruz thus surmises that he was being "set ... up for failure." (*Id.*).

Before De la Cruz joined Team Five, Dannhauser met with Linares to "provide her with instructions and recommendations regarding her supervision" of De la Cruz. (Dannhauser Decl. ¶¶ 52–53). It was during this meeting in January 2008 that Linares first became aware of De la Cruz's performance on Team Two. (Linares Decl. ¶ 10). Dannhauser explained to her that, while on Team Two, De la Cruz "had failed to grasp certain [necessary] concepts and techniques." (*Id.* ¶ 11). Dannhauser further indicated that De la Cruz's transfer to Team Five was intended to give him a "fresh start" and allow him to be "retrained for his job from the beginning" Linares' assigned role was to help De la Cruz "acquire and build the skills which he lacked and which were essential for" his position. (*Id.*). Dannhauser also instructed Linares to provide De la Cruz with clear assessments, meet with him every month to discuss his progress, and to maintain "copious" notes of those meetings.[8] (*Id.* ¶ 12).

### G. *De la Cruz's Performance on Team Five*

In or about February 2008, De la Cruz was reassigned to Team Five. (*Id.* ¶ 16). Immediately after the reassignment, Linares met with De la Cruz to discuss her expectations, the responsibilities of a Performance Monitor, and her management style. She explained that her "hands-on" management approach included holding supervision meetings with Performance Monitors every two weeks and playing an active role in overseeing Team Five's work product. (*Id.* ¶ 17). She also warned him that "she was not about to clear the path for [him]." (Pl.'s Suppl. Decl. ¶ 43).

Linares maintains that she immediately concluded that De la Cruz's performance was "poor, as were his attendance and punctuality." (Linares Decl. ¶ 18). De la Cruz disputes this, alleging that soon after he joined Team Five, Linares expressed satisfaction with his performance, stating "damn you are good, [Telford] is stupid for letting you go." (Pl.'s Suppl. Decl. ¶ 49). De la Cruz also contends, however, that Linares sabotaged his performance by, among other things, giving him incorrect instructions for data entry into APA databases. (*See* Aff. of Audra Fobbs, dated Jan. 28, 2009, at 1).

On February 12, 2008, De la Cruz was absent from work without giving prior notice to Linares or anyone else at APA. (Barrett Decl. Ex. K at 3 (Linares' Individual Supervision Summary, dated Feb. 13, 2008)). The next day, De la Cruz explained that he thought February 12 was a holiday. Linares was "suspicious" of his explanation because she considered it "extremely difficult to believe that [De la Cruz], ... who had demonstrated an extensive familiarity with ACS's regulations in the past, did not know that February 12th was a work day." (Linares Decl. ¶ 22). Nonetheless, Linares simply reminded him that ACS policy required him to notify APA management in advance of any absences. (*Id.* ¶ 21).

On March 27, 2008, De la Cruz again was absent from work. He telephoned

---

**8.** According to Linares, these instructions were "not ... unusual" since Dannhauser had given her similar instructions with respect to Audra Fobbs, an African–American Performance Monitor on Team Five. Dann-

hauser later reassigned Fobbs to a different ACS unit because of performance concerns. (Linares Decl. ¶ 13; Def.'s 56.1 Stmt. ¶¶ 46–47, 74).

APA that morning to say he would not be in until the afternoon, but was absent the entire day without placing a second call to APA. (*Id.* ¶ 25). At a meeting with Linares on March 28, De la Cruz explained that he was absent because he had to attend to his aunt, who was in the hospital, and hence was unable to call. (*Id.* ¶ 26). In response, Linares again explained the ACS leave policies. (*Id.* ¶ 27). Linares also commented on De la Cruz's work performance and ways in which he could improve his work. (*Id.* ¶ 28).

In April 2008, Linares "became increasingly concerned" that De la Cruz's work product was unreliable and inaccurate. (*Id.* ¶ 35). She held several one-on-one meetings with him to discuss these concerns and provide him with guidance. (*See* Barrett Deck Ex. K at 5–10 (Linares' Individual Supervision Summaries, dated Apr. 7, 11, and 25, 2008)). During these meetings, Linares explained to De la Cruz that he seemed unable to "synthesize data" or "think critically," and that his writing "lacked clarity." (Linares Decl. ¶ 40). Linares also discussed De la Cruz's "poor time management," which she noted was evidenced by the fact that he completed seven agency reviews in only two days despite being given two weeks to do so, and his lack of professionalism, which she believed was evidenced by his frequent late arrivals to meetings with provider agencies. (*Id.* ¶¶ 39, 41–42).

During one of the supervision meetings in April 2008, De la Cruz asked Linares to approve an overtime request. (*Id.* ¶ 37). Linares was reluctant to do so, however, before receiving assurance that he "was using his regular time efficiently and that his assigned work warranted overtime." (*Id.*). Based on this response, De la Cruz

believed that Linares had "illegally" denied him overtime. (*Id.* ¶ 38).

In late April 2008, in an effort to assess her team's work, Linares reviewed a randomly-selected provider agency review prepared by each Performance Monitor. (*Id.* ¶ 49). After reading De la Cruz's review, she concluded that he had "failed to identify very serious issues regarding children's safety," a shortcoming which "alarmed" her. Dannhauser and Martin reacted similarly when Linares informed them of the results of her case review. (*Id.* ¶¶ 49–50).

### H. *De la Cruz's Demotion*

In May 2008, after meeting with De la Cruz and Linares regarding De la Cruz's work performance, Dannhauser decided that De la Cruz was "not able to meet the responsibilities of his provisional title and, therefore, would be re-assigned to a job in his underlying permanent title." [9] (Dannhauser Decl. ¶¶ 56–57). Dannhauser informed De la Cruz of this decision during a meeting that month, at which Linares and De la Cruz's union representative also were present. Dannhauser told De la Cruz that "he was not getting better as an APA monitor, that his performance was still unsatisfactory, and that [they] were going to have him reassigned to another part of ACS." (*Id.* ¶ 58). De la Cruz reacted in a "belligerent" manner, slamming his hands on the table. (Linares Decl. ¶ 53). He yelled at Linares, saying "something to the effect of 'I can't believe you did this' and 'you have kids.' " (*Id.*).

Shortly thereafter, the ACS Office of Personnel Services informed De la Cruz that he had been demoted from his provisional Supervisor III title and reassigned to his "permanent leave line title of Child Welfare Specialist level I." (Barrett Decl.

---

**9.** Prior to deciding that De la Cruz should be reassigned, Dannhauser had taken a similar course of action with respect to Audra Fobbs. (Dannhauser Decl. ¶ 59).

Ex. V (letter from Assistant Commissioner Janet Subrizi to De la Cruz, dated May 15, 2008)). Following his demotion, De la Cruz was assigned to work in a "cramped, dusty and unsanitary storage room with no windows or ventilation." (De la Cruz Decl. ¶ 53).

In May 2009, De la Cruz received notice from the ACS Commissioner that, due to budget cuts, positions in his title had been targeted for layoff. (Barrett Decl. Ex. N). In September 2009, to avoid being laid off, De la Cruz "invoked his 'bumping' rights," returning to the position of Child Welfare Specialist, the next lower title in his line of promotion. (Def.'s 56.1 Stmt. ¶ 85; Pl.'s 56.1 Resp. Stmt. ¶ 85).

### I. *De la Cruz's EEQC Charge and the Instant Action*

On May 20, 2008, De la Cruz submitted a charge of discrimination to the EEOC ("2008 EEOC Charge"). In his charge, De la Cruz alleged that ACS had discriminated against him by subjecting him to "comments [and] remarks about [his] age, national origin, and partial disability as a result of an on-the-job injury [on] Oct[ober] 15, 2007." (Barrett Decl. Ex. L (EEOC charge dated May 15, 2008)). He further alleged that ACS had retaliated against him for filing an "EEO charge" in 1992. (*Id.*).

On January 21, 2009, the EEOC issued De la Cruz a right-to-sue letter. (*Id.* Ex. M). Subsequently, on April 17, 2009, De la Cruz commenced an action against the City in State Supreme Court, New York County. (*See* ECF No. 1). In his complaint, De la Cruz alleged that the City had violated Title VII, the ADEA, and the Americans with Disabilities Act by "subject[ing him] to a hostile work environ-

ment, disparate treatment and intentional discrimination due to his national origin (Hispanic), gender (male), age–47 years old, perceived disability, and retaliation." (Compl. 2–3).

On May 26, 2009, the City removed De la Cruz's suit to this Court pursuant to 28 U.S.C. §§ 1441(b), 1443. (*See* ECF No. 1). In August 2009, pursuant to 28 U.S.C. § 636(c), the parties consented to my exercise of jurisdiction over all further proceedings in this action. (*See* ECF No. 8). The City subsequently filed its motion for summary judgment on July 23, 2010. (ECF Nos. 19–22). De la Cruz filed opposition papers on September 22, 2010, (ECF Nos. 25–33), and the City filed reply papers on October 6, 2010, (ECF Nos. 34–35).[10] The City's motion therefore is fully submitted.

### J. *Parties' Contentions*

The parties disagree as to whether it was Dannhauser or another APA supervisor who made the decision to demote De la Cruz in May 2008. At his deposition, De la Cruz testified that Dannhauser was the "ultimate party responsible for [his] demotion." (De la Cruz Dep. 77). Nevertheless, in his opposition papers, De la Cruz suggests, for the first time, that Telford was the decisionmaker. (*See* De la Cruz Decl. ¶ 33 ("Dannhauser was acting under Telford's pressure"); Pl.'s Suppl. Decl. ¶ 41 ("Mr. Dannhauser expressed that it is not him who is making these decisions.")). Because De la Cruz's declaration contradicts his deposition testimony, the City argues that this portion of his declaration should be disregarded. (ECF No. 35 ("Def.'s Reply Mem.") at 4–5).

---

**10.** Attached to De la Cruz's opposition papers are approximately two hundred pages of exhibits that do not bear Bates stamp numbers. (*See* Pl.'s Decl. Exs. A–T). Many of these exhibits are illegible. They also do not appear to be organized in any fashion.

Turning first to his national origin claim, De la Cruz contends that "[a]n atmosphere against Hispanics permeated the work force" at APA. (Pl's Mem. at 5). He further alleges that Telford and other teammates drew conclusions about him based on ethnic stereotypes. In particular, he maintains that Telford's comment regarding her prior work in the Corrections Department was a reference to De la Cruz's Hispanic background. (De la Cruz Decl. ¶ 19). De la Cruz further maintains that Telford and Flavin, another Team Two Performance Monitor, started rumors portraying him as a "typical violent Hispanic man that needs anger management." (Id.). He also contends that Flavin's comment that "they are all the same" constituted a reference to the notion that "Hispanic[s] indulge in deceptive practices," thus labeling him as "one of those Hispanics." (De la Cruz Dep. 64).

In further support of his national origin discrimination claim, De la Cruz points to certain comments Telford allegedly made regarding Hispanic provider agencies. For example, according to De la Cruz, during a team meeting, Telford "incited the team to joke about the folklore and spiritual beliefs" of two Hispanic provider agencies. Additionally, after Team Two accepted a lunch of cultural dishes prepared by a Hispanic provider agency, Telford cautioned the team to be careful about accepting such benefits in the future because of the agency's "devious behavior." De la Cruz understood this to be an instruction not to accept food from Hispanic provider agencies because of the "risk" that they might "poison" or "harm" APA staff with "their voodoo or ritualistic practices." (Pl.'s Suppl. Decl. 1106).

De la Cruz's age discrimination claim is based on several allegedly ageist comments made by Tirado, one of his fellow Performance Monitors on Team Two. In the presence of De la Cruz, Tirado often referred to himself as "the new blood" of ACS. (De la Cruz Dep. 56). Tirado also alluded to De la Cruz's seniority at ACS, and he questioned De la Cruz's ability to walk up the hills near the provider agencies' offices. De la Cruz maintains that his "presence alone triggered these remarks." (Id. at 56–57).

De la Cruz bases his retaliation claim on events that occurred after he raised allegations of differential and unfair treatment "in November 2007 and at other times." (Pl's Mem. at 4–6). Specifically, De la Cruz alleges that APA management retaliated against him by tampering with his timesheets, overseeing his work with "microscopic scrutiny," assigning him the "largest and most complex caseload of the team," subjecting him to threats and "gender and ethnic remarks," making "harassing telephone calls [to] his home," and sharing confidential medical information with his colleagues. (Id. at 5–6). De la Cruz's deposition testimony and 2008 EEOC Charge suggested, however, that his retaliation claim was based on two entirely different protected activities: the filing of his EEOC charge in 1992 and his threat of filing a workers' compensation claim for the injuries he allegedly suffered when he fell on October 15, 2007. (Barrett Deck Ex. L; De la Cruz Dep. 76–77).

Finally, De la Cruz contends that all of the foregoing incidents, viewed collectively, gave rise to a hostile work environment at ACS. (Pl.'s Mem. at 10–11). The City argues that De la Cruz cannot maintain this claim because he did not raise it in his 2008 EEOC Charge. (ECF No. 22 ("Def.'s Mem.") at 3–4).

The City further asserts that De la Cruz's "poor job performance" was a legitimate, nondiscriminatory reason for his demotion. (Id. at 14–15). De la Cruz counters that his APA supervisors had "good

impressions" of his work, and that he in fact received "commendations." (De la Cruz Dep. 43). He further contends that Telford's criticisms of his work were "disingenuous," and that APA "never pointed to specific[ ] deficiencies" in his work. (De la Cruz Decl. ¶ 36).

## III. *Discussion*

### A. *Applicable Law*

#### 1. *Standard of Review*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact" based on supporting materials in the record. Fed.R.Civ.P. 56.

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 78 (2d Cir.2002); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. *See Beyer v. Cnty. of Nassau,* 524 F.3d 160, 164 (2d Cir.2008). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. *Fischl,* 128 F.3d at 55; *see also* Fed.R.Civ.P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be-tried." *Fischl,* 128 F.3d at 55.

To defeat a motion for summary judgment, however, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### 2. *Title VII and ADEA*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Under the ADEA, it is unlawful for "an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The protections of this act, however, extend only to persons who are "at least 40 years of age." *Id.* § 631(a).

##### a. *McDonnell Douglas Framework*

To overcome a motion for summary judgment with respect to claims under Title VII and ADEA, "a discrimination plaintiff must withstand the three-part burden-shifting laid out by *McDonnell Douglas Corp. v. Green,*" 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (ADEA); *Dawson v. Bumble & Bumble,* 398 F.3d 211, 216 (2d Cir.2005) (Title VII). Under that rubric, the plaintiff must satisfy an initial burden of "proving by the preponderance of the evidence a *prima*

*facie* case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a *prima facie* case, an employee must show that: (a) he was within the protected class; (b) his job performance was satisfactory; (c) he was subjected to an adverse employment decision or discharge; and (d) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006); *Stratton v. Dep't For the Aging,* 132 F.3d 869, 879 (2d Cir.1997).

■ "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks omitted). "To be materially adverse[,] a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal quotation marks omitted). Among the actions that qualify as materially adverse are "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Id.*

■ Once the plaintiff makes out a *prima facie* case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." *Sharpe v. MCI Commc'ns Servs., Inc.,* 684 F.Supp.2d 394, 401 (S.D.N.Y.2010) (quoting *Stratton,* 132 F.3d at 879). The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Feld-*

*er v. Securitcus Sec. Serv.,* No. 04 Civ. 9501(LAK), 2006 WL 2627969, at *7 (S.D.N.Y. Sept. 12, 2006) (quoting *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1335 (2d Cir.1997) (*en banc* )).

■ Finally, if the defendant provides a nondiscriminatory rationale for its conduct, the rebuttable presumption drops out of the case. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual, but also that the defendant discriminated against the plaintiff. *Slattery v. Swiss Reins. Am. Corp.,* 248 F.3d 87, 93–94 (2d Cir.2001). In other words, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000). Under Title VII, discrimination need not be the sole reason for the defendant's actions, so long as it is a reason for the adverse employment action; under the ADEA, however, a plaintiff must show that the action would not have occurred "but for" the plaintiff's age. *Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 106–07 (2d Cir.2010) (ADEA); *Holcomb v. Iona Coll.,* 521 F.3d 130, 142 (2d Cir.2008) (Title VII).

### b. Hostile Work Environment

■ An employee also may suffer discriminatory treatment in violation of Title VII or the ADEA if he is required to work in a hostile or abusive environment. *See Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (Title VII); *Brennan v. Met. Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999) (ADEA). To prevail on this theory, a plaintiff must prove (a) that he subjectively perceived the environment to be abusive; (b) that his working environment was "objectively hostile" and (c) that

a specific basis exists for imputing the harassing conduct to the employer. *See Howley v. Town of Stratford*, 217 F.3d 141, 153–54 (2d Cir.2000) (Title VII); *Pronin v. Raffi Custom Photo Lab., Inc.*, 383 F.Supp.2d 628, 633–34 (S.D.N.Y.2005) (Title VII and ADEA); *O'Dell v. Trans World Entm't Corp.*, 153 F.Supp.2d 378, 385 (S.D.N.Y.2001) (Title VII). Mere "workplace bullying," however, is not enough to give rise to an actionable hostile work environment claim. Rather, there must be a showing that the conduct occurred because of the employee's membership in a protected class. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir.2002) (Title VII); *Meder v. Bd. of Educ. of City of N.Y.*, 135 Fed.Appx. 467, 468 (2d Cir.2005) (ADEA).

To determine whether a work environment is "objectively hostile," a court must examine all of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "[H]arassment is actionable ... only if it is so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)) (second brackets in original; internal quotations marks deleted). Isolated incidents of harassment, unless "extremely serious," are not sufficient to give rise to a hostile work environment claim. *See id.* at 271, 121 S.Ct. 1508; *Howley*, 217 F.3d at 153–54: *O'Dell* 153 F.Supp.2d at 386; *see also Perry v. Ethan*

*Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997) (incidents of harassment must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive") (citing *Carrero v. N.Y. City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir.1989)).

### 3. *Retaliation*

Both the ADEA and Title VII make it unlawful for an employer to retaliate against an employee who has exercised his statutory right to complain about conduct that he considers discriminatory. 29 U.S.C. § 623(d); 42 U.S.C. § 2000e–3(a). A retaliation claim is "not dependent on the merits of the underlying discrimination complaint." *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir.1986). Thus, to establish a *prima facie* case of retaliation, an employee need only show that: (a) the employee engaged in a protected activity; (b) the employer knew of this activity; (c) the employer took adverse action against the employee; and (d) there was a causal relation between the adverse action and the employee's protected activity. *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *Holt v. KMI–Cont'l, Inc.*, 95 F.3d 123, 130 (2d Cir.1996). The filing of a complaint with an anti-discrimination agency is such a protected activity. 42 U.S.C. § 2000e–3(a); *see Terry v. Ashcroft*, 336 F.3d 128, 140–42 (2d Cir.2003).

Mere temporal proximity between a plaintiffs protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a *prima facie* case. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932–33 (2d Cir.2010); *Simpson v. N.Y. State Dep't of Civil Serv.*, 166 Fed.Appx. 499, 502 (2d Cir.2006). However, temporal proximity, without more, "is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext" at the

third stage of the *McDonnell Douglas* inquiry. *Simpson.* 166 Fed.Appx. at 502.

### B. *Application of Law to Facts*
#### 1. *Demotion*
##### a. *Title VII National Origin Claim*

It is undisputed that De la Cruz is Hispanic and, therefore, a member of a class protected by Title VII. (Pl.'s 56.1 Resp. Stmt. ¶ 1; Def's 56.1 Stmt. ¶ 1); *see* 42 U.S.C. § 2000e–2(a). The City further concedes that De la Cruz was demoted in May 2008 when Dannhauser caused him to be reassigned to a different unit within ACS. (Def.'s 56.1 Stmt. ¶ 66; *see* Barrett Decl. Ex. V). The remaining elements of a *prima facie* Title VII claim require De la Cruz to show that (i) his performance as a Performance Monitor was satisfactory, and (ii) the surrounding circumstances give rise to an inference that his demotion arose out of discrimination on the basis of his national origin. *See Demoret,* 451 F.3d at 151.

■ There is considerable evidence that ACS's concerns about De la Cruz's work as a Performance Monitor were justified. For example, other than in an *unsworn* Response to Defendant's Rule 56.1 Statement, De la Cruz has not denied that he fell asleep twice at provider agencies' offices. De la Cruz's numerous performance deficiencies are also detailed in the declarations of Telford, Linares, and Dannhauser submitted in support of the City's motion, and in contemporaneous internal ACS memoranda indicating that APA supervisors attempted to provide additional support for De la Cruz, but that his work still did not pass muster. (Barrett Decl. Exs. I, J, K).

■ The only countervailing evidence presented by De la Cruz is that Dannhauser allegedly told him that he did "excellent" work on reports concerning two providers, and that, some two to three weeks after his transfer to Team Five, Linares allegedly commented, "damn you are good." Although these isolated remarks do not suggest that either Dannhauser or Linares considered De la Cruz's overall performance to be satisfactory, for purposes of the City's summary judgment motion, the Court will indulge in the presumption that De la Cruz has adduced evidence sufficient to create a genuine factual issue as to the adequacy of his work as a Performance Monitor. De la Cruz's evidence nevertheless fails to satisfy the fourth required element of a *prima facie* Title VII claim arising out of his demotion, namely, that the adverse action occur under circumstances giving rise to an inference of discrimination. *See Demoret,* 451 F.3d at 151.

In an effort to make the requisite showing, De la Cruz relies on a handful of statements by APA personnel. First, De la Cruz alleges that, after describing him as a problem employee during the November 9 Meeting, Telford commented, "I worked in Corrections. I know the behavior." (De la Cruz Decl. ¶ 32). De la Cruz construes this remark as an acknowledgment that Telford "knew the behavior of *inmates*" and therefore had "made up her mind about [him] because [he is] Puerto Rican." (*Id.* ¶ 19) (emphasis added). In context, the remark appears more likely to have been a reference to Department of Correction *employees,* a group which De la Cruz has not shown to be overwhelmingly Hispanic.[11] However, even if De la Cruz is

---

11. A recent Workforce Analysis by the City's Equal Employment Practices Commission indicates that only 17 percent of Department of Correction personnel are Hispanic, 65 percent are Black, and 15 percent are Caucasian. See Workforce Analysis Calendar Year 2008, *available at* http://www.nyc.gov/html/eepc/

correct that Telford was comparing him to inmates, there is absolutely no reason to believe that Telford's remark suggested an anti-Hispanic bias, rather than a belief that De la Cruz's performance—as an individual, rather than a member of a class—left quite a bit to be desired.[12]

De la Cruz also alleges that, during this same meeting, Flavin remarked "they are all the same" after a lengthy diatribe against him. (De la Cruz Decl. ¶ 31). Even if this remark evidences an anti-Hispanic bias, there is no suggestion that Flavin played any role whatsoever in De la Cruz's demotion. As a consequence, whatever Flavin's personal beliefs may have been, they would not permit a finding that the decisionmaker(s) who demoted De la Cruz did so because of an anti-Hispanic bias.[13]

In sum, none of the scattered remarks that De la Cruz cites suggests that the circumstances surrounding his demotion reflect discrimination against him on national origin grounds. *See Hurd v. N.Y. City Health & Hosps. Corp.,* No. 07 Civ. 1250, 2008 WL 5120624, at *1 (2d Cir. Dec. 8, 2008) (plaintiff's reliance on "conclusory statements regarding one supervisor's favoritism towards Hispanics" was insufficient to establish inference of discrimination).

In an effort to establish that his demotion was based on his national origin, De la Cruz notes that, despite his entreaties not to do so, Telford and Flavin decided to close down two programs operated by a Hispanic provider agency, and transferred its caseload to two other non-Hispanic agencies. (De la Cruz Decl. ¶ 22). However, in his papers, De la Cruz concedes that the Hispanic agency had been placed on probation months earlier. (*Id.*). In the absence of any statistical analysis showing that Telford (or Flavin) closed down more programs operated by Hispanic agencies than programs operated by non-Hispanic agencies, no reasonable inference that Telford had a bias against Hispanic *employees* can be drawn from this isolated incident.

De la Cruz also notes that after a site visit to a Hispanic provider agency, during which "cultural dishes" were served for lunch, Telford cautioned that, "given the 'devious behavior' of 'these agencies,' we

downloads/pdf/Workforce%20Analvsis %202008.pdf (last visited Apr. 6, 2011).

**12.** There are, of course, relatively few inmates at Rikers Island since most of the persons held there are pretrial detainees. *See* http://www.nyc.gov/html/doc/html/facilities/locate_facility.shtml (last visited Apr. 6, 2011). A recent Department of Correction Language Access Plan indicates that 57 percent of the individuals in the department's custody are Black, 34 percent are Hispanic, and 7 percent are Caucasian. *See* http://www.nyc.gov/html/doc/downloads/pdf/lap_doc.pdf (last visited Apr. 6, 2011). Given these statistics, there is no reason to believe that a comparison of De la Cruz to inmates—if that is what Telford's remark was intended to be—reflected an anti-Hispanic bias.

**13.** De la Cruz also alleges that Flavin and Telford spread rumors "around the office" that he was the "typical violent Hispanic man that needs anger management" and said that they were fearful of him. (De la Cruz Decl. ¶ 19). Tellingly, De la Cruz does not suggest that any of these statements were made in his presence. Nor has he offered the sworn testimony of any individual who allegedly heard such statements being made. Accordingly, even if these alleged statements are not offered for the truth, but merely for the fact that they were made, they still constitute inadmissible double hearsay. *See Patterson v. Cnty. of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial"); Fed.R.Evid. 805 (hearsay within hearsay). For this reason, De la Cruz cannot establish his Title VII claim based on the rumors he attributes to Flavin and Telford.

[*sic* ] better be careful with what we accept from them next time." (Pl.'s Suppl. Decl. ¶ 106). De la Cruz understood this to be a statement that the Performance Monitors should not accept an invitation for lunch from any *Hispanic* agencies. (*Id.*). If is, of course, potentially a misdemeanor under the New York Penal Law for a City worker to accept a free meal from an agency he is assigned to monitor. *See* N.Y. Penal Law § 200.35 (receiving unlawful gratuities). De la Cruz has not explained why this advice, which merely comported with the law, evidenced Telford's bias against Hispanic employees. Indeed, Team Two had two other Hispanic Performance Monitors, Tirado and Rivera, both of whom have continued to report to Telford in the years since De la Cruz's demotion. (Telford Decl. ¶ 44).

Perhaps most importantly, the decision to demote De la Cruz was made by Dannhauser. De la Cruz has not attributed any allegedly discriminatory remarks to Dannhauser, who was also the supervisor who made the decision to hire him as an APA Performance Monitor. (Def.'s 56.1 Stmt. ¶ 4; Pl.'s 56.1 Resp. Stmt. ¶ 4). Although Dannhauser's role in that prior employment decision is not dispositive, it certainly serves to undermine De la Cruz's claim of national origin discrimination. *See Schnabel v. Abramson,* 232 F.3d 83, 91 (2d Cir. 2000) ("[W]here the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.") (citing *Grady v. Affiliated Cent. Inc.,* 130 F.3d 553, 560 (2d Cir.1997)).

Finally, in an effort to attribute a discriminatory motive to Dannhauser's decision to demote him, De la Cruz argues that it really was "caused by . . . Telford and Linares since [it] was based upon false information given to Dannhauser by Telford and Linares." (Pl.'s Suppl. Decl. ¶ 65). As noted above, even if the Court were to assume that Telford inaccurately reported that De la Cruz was a problem employee, there simply is no admissible evidence which suggests that she did so because De la Cruz is Puerto Rican. Moreover, even if Telford had a discriminatory motive, her complaints resulted in De la Cruz's transfer to Team Five, not his demotion.

As Dannhauser explains, it was only after the transfer to Linares' team that Dannhauser decided to demote De la Cruz.

> In May, 2008, it became apparent to me, based on Ms. Linares' reports and observations regarding plaintiff's lack of progress and poor work habits, that plaintiff's performance continued to suffer from many of the same deficiencies as it had while he was on Supervisor Telford's team. It was for this reason that I determined that plaintiff was not able to meet the responsibilities of his provisional title and, therefore, would be re-assigned to a job in his underlying permanent title.

(Dannhauser Decl. ¶ 57). Thus, Dannhauser's decision to demote De la Cruz was based on *Linares'* dissatisfaction with De la Cruz after his transfer to Team Five. Not surprisingly, even De la Cruz does not attempt to argue that Linares, who is herself a Hispanic woman, fed false information to Dannhauser because she is biased against Hispanics.

▮ In sum, De la Cruz's claim that he was demoted because he is Hispanic is entirely grounded on conjecture and inadmissible evidence. Moreover, even if De la Cruz were able to establish a *prima facie* case of national origin discrimination, his proof is clearly insufficient to show that the City's proffered legitimate reasons for his demotion are pretextual. The City is therefore entitled to summary judgment

with respect to De la Cruz's national origin discrimination claim to the extent it is based upon his demotion.

### b. *ADEA Claim*

De la Cruz also contends that several allegedly ageist comments made by Tirado raise an inference of age discrimination. De la Cruz notes in that regard that Tirado often referred to himself as the "new blood" at ACS and alluded to both De la Cruz's seniority at ACS and his state of physical fitness in a derogatory fashion. (De la Cruz Dep. 56). Although it is undisputed that De la Cruz was born in 1962, and therefore was over the age of forty at the time of the events at issue, (Def's 56.1 Stmt. ¶ 1; Pl.'s 56.1 Resp. Stmt. ¶ 1), Tirado's comments do not support an inference that De la Cruz was demoted due to his age, nor are they sufficient to rebut the City's proffered reason for his demotion.

At the outset, allegedly discriminatory comments made by a non-decisionmaker are, as a matter of law, insufficient to raise an inference of discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J. concurring) ("statements by nondecisionmakers, or statements made by decisionmakers unrelated to the decisional process itself" are insufficient to establish discriminatory intent): *see also Muhleisen v. Wear Me Apparel LLC*, 644 F.Supp.2d 375, 388 (S.D.N.Y.2009) ("Statements by non-decisionmakers are not sufficient to show pretext.") (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 137 (2d Cir.1997)). Nor can a discrimination plaintiff rely solely on "stray remarks," even if made by a decisionmaker, to prove her claim. *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir.2001).

Here, Tirado's allegedly ageist remarks do not establish an inference that De la Cruz's demotion was due to his age. Indeed, Tirado held the same position as De la Cruz on Team Two and had no decisionmaking authority with respect to De la Cruz's job. There also is no indication that Tirado made the comments attributed to him in the presence of Dannhauser or any other APA decisionmaker. Finally, De la Cruz has not adduced any evidence that his age was a "but-for" reason for his demotion, or that he would have retained his position as a Performance Monitor had he been younger. In fact, the record contains an abundance of evidence supporting the City's contention that De la Cruz was demoted because of his poor work performance rather than his age. (*See* Barrett Decl. Exs. I, J, K). The City is therefore entitled to summary judgment on De la Cruz's age discrimination claim.

### 2. *Hostile Work Environment*

### a. *Exhaustion of Administrative Remedies*

In his complaint, De la Cruz also asserts a hostile work environment claim based on his age and national origin. (Compl. 2). The City argues that it is entitled to summary judgment on these claims because they were not administratively exhausted. (Def.'s Mem. at 3–4).

Title VII and the ADEA both require that a plaintiff exhaust his administrative remedies by filing a timely charge of discrimination with the EEOC before initiating a suit arising out of his charge. 29 U.S.C. § 626(d); 42 U.S.C. §§ 2000e–5(e)(1), (f)(1); *see Falso v. Gates Chili Cent. Sch. Dist.*, 408 Fed.Appx. 494, 495–96 (2d Cir.2011) (Title VII); *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 158 (2d Cir.2008) (ADEA). Once a plaintiff has satisfied this procedural require-

ment, he then may "raise any claim that is 'reasonably related' to those asserted in the EEOC filing." *Id.* (citing *Cornwell v. Robinson,* 23 F.3d 694, 706 (2d Cir.1994)). A claim is "reasonably related" if it involves conduct that "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts v. N.Y. Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1402 (2d Cir.1993) (internal quotation marks omitted), *superseded on other grounds by statute as recognized in Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 693 (2d Cir.1998). Accordingly, the Court's analysis should focus on "the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin v. Kerik,* 335 F.3d 195, 201 (2d Cir.2003) (internal quotation marks omitted).

■ In his 2008 EEOC Charge, De la Cruz alleged that, while he was serving as an APA Performance Monitor, he was subjected to "comments" and "remarks about [his] age, [and] national origin." (Barrett Decl. Ex. L). To support the hostile work environment claim in this lawsuit, De la Cruz relies on many of the allegations proffered in support of his claims relating to his demotion. (*See* Compl. 2–5; Pl.'s Mem. at 10–11). Thus, he alleges with respect to both types of claims that, because of his protected status, his supervisors demoted him, assigned him an "excessive" work load, subjected him to "ethnic remarks," threatened and "continuously harassed" him, and created "[a]n atmosphere against Hispanics" throughout the APA unit. (*Id.*). Given this overlap, it is clear that the conduct associated with his hostile work environment claim would have fallen within the scope of the EEOC's investigation of his charged claims. *See Pilgrim v. McGraw–Hill Co.,* 599 F.Supp.2d

462, 491 (S.D.N.Y.2009) (plaintiff's unexhausted hostile work environment claim was reasonably related to her EEOC charge regarding "systemic" discrimination and supervisor's use of "foul and offensive" language). De la Cruz's hostile work environment claim consequently is reasonably related to his improper demotion claims and need not be separately administratively exhausted.

### b. *De la Cruz's Work Environment Was Not Hostile*

■ The City contends that certain of the actions cited by De la Cruz were not so severe or pervasive as to constitute a change in the terms and conditions of his employment. (Def.'s Mem. at 18). The City further maintains that De la Cruz "has failed to demonstrate a causal nexus between" certain of the incidents cited in his papers and his protected status. (*Id.* at 19).

De la Cruz's hostile work environment claim is based on a laundry list of alleged wrongs. (*See* Pl.'s Mem. 10–11). Several of the matters about which he complains do not rise to the level of an actionable hostile work environment claim. These include his reassignment to Team Five, the changes in his work schedule, the alleged increased scrutiny of his work, and Tirado's stray remarks regarding his seniority and physical fitness (or lack thereof). *See e.g., Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761–62, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (reassignment without material change in benefits or responsibilities is not a tangible employment action); *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 713 (2d Cir.1998) (supervisor's occasional racial remark does not establish hostile work environment claim); *Holt v. Roadway Package Sys., Inc.,* 506 F.Supp.2d 194, 203 (W.D.N.Y.2007) (allegations regarding supervisor's increased oversight of

plaintiff's performance, hours, and work product are insufficient to support hostile work environment claim).

The remaining bases for De la Cruz's hostile work environment claim focus on the November 9 Meeting, during which both Telford and other Team Two Performance Monitors confronted him about his injury in a train station and other issues. (*See* De la Cruz Decl. ¶¶ 31–32). Taking De la Cruz at face value, it seems clear that he was deeply troubled by what transpired during this apparent attempt to conduct some form of an "intervention." Moreover, a single event, if severe enough, can be sufficient to establish the existence of a hostile work environment. *Torres v. Pisano,* 116 F.3d 625, 631 n. 4 (2d Cir. 1997). The difficulty De la Cruz faces, however, is the same one that sounded the death knell for his wrongful demotion claims. Thus, he has failed to adduce evidence from which a jury could reasonably conclude that the hostility he encountered was a result of his age or national origin, rather than, for example, his work habits. De la Cruz similarly has not shown that other events upon which he relies—including the alleged tampering with his timesheets and work product—were linked to his age or national origin.[14]

Moreover, assuming that the *McDonnell Douglas* burden shifting analysis applies to a hostile work environment claim, *see Connolly v. The TJX Cos.,* No. 07 Civ. 3282(JS)(WDW), 2010 WL 5491109, at *5 (E.D.N.Y Dec. 30, 2010) ("Under the *McDonnell Douglas* burden-shifting framework for Title VII cases, the burden lies initially with the plaintiff to make out a *prima facie* case for her hostile work environment ... claim."); *see also Langford v. Int'l Union of Operating Eng'rs, Local 30,* No. 10 Civ. 1644(RJH), 2011 WL 672414, at *7 (S.D.N.Y. Feb. 23, 2011) ("[T]he *Swierkiewicz* [*v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ], holding applies with equal force to any claim ... that the *McDonnell Douglas* framework covers, including claims of retaliation, disparate treatment, and hostile work environment ....") (internal quotation marks omitted), the City has explained the actions of De la Cruz's supervisors through several contemporaneous memoranda discussing De la Cruz's unsatisfactory work. (*See* Barrett Decl. Exs. I, J, K). In response, De la Cruz has merely speculated that the conduct to which he allegedly was subjected occurred because of his age and national origin. This showing is insufficient for him to meet his burden if *McDonnell Douglas* applies.

Summary judgment therefore is granted on De la Cruz's hostile work environment claim.[15]

### 3. *Retaliation Claim*

De la Cruz's final claim is that his APA supervisors retaliated against him because he engaged in four protected activities: (a) filing a complaint of discrimination in 1992; (b) threatening to file a workers' compen-

---

**14.** In fact, De la Cruz testified that he believed Martin tampered with his timesheet on account of his alleged disability, but that it was eventually corrected. (De la Cruz Dep. 75–76).

**15.** De la Cruz contends that several events occurring after his demotion also give rise to a hostile work environment. Included among these are his assignment to an undesirable office space, a delay in receiving the tasks and standards for his current position, and ACS's

planned "abolish[ment]" of that position. (Compl. 4; Pl.'s Mem. at 10–11). Here, again, De la Cruz has failed to adduce any evidence that ACS undertook these actions because of his age or national origin. There also is no indication that any of the alleged harassers in APA continued to have any decisionmaking authority over De la Cruz after he was demoted and transferred to an unrelated ACS office.

sation claim with respect to the injuries he allegedly sustained when he fell on October 15, 2007; (c) raising allegations of discrimination in the November 9 Memorandum; and (d) filing the 2008 EEOC Charge. (*See* Barrett Decl. Exs. L, Q; De la Cruz Dep. 76–77; PL's Mem. at 4).

The City argues that De la Cruz should not be permitted to claim retaliation on the basis of his November 9 Memorandum and 2008 EEOC Charge because he first raised these allegations when he filed his opposition papers. (*See* Def.'s Reply Mem. at 7–8) (alleging that De la Cruz is "attempting to raise a feigned issue of fact"). At his deposition, however, De la Cruz gave the following testimony:

Q. Are you also alleging that any, other than of the persons you mentioned here today, retaliated against you for filing a complaint?

. . .

A. Yes. Like I have mentioned, I sent a letter to my administrator, Ms. Jacqueline Martin and Mr. Jess Dannhousen where [*sic*] I filed my complaint *and subsequently I filed with the EEOC as well.*

(De la Cruz Dep. 79) (emphasis added). While neither the question nor the answer is a model of clarity, De la Cruz does appear to be referring to both his November 9 Memorandum (addressed to Martin and copied to Dannhauser) and his 2008 EEOC Charge in response to the City's inquiry concerning the scope of his retaliation claims. Accordingly, there does not appear to be a factual basis for the City's contention that De la Cruz's reliance on these documents in connection with his retaliation claims is a recent invention. I therefore will consider each asserted basis for De la Cruz's retaliation claim.

### a. *1992 EEO Charge*

De la Cruz provides no admissible evidence to support his assertion that ACS retaliated against him in 2007 based upon an EEO charge he filed in 1992, when he held a non-APA position at ACS. In his papers, the only discussion of the circumstances surrounding the 1992 charge is found in several self-serving and unsupported statements in his declaration. (*See* De la Cruz Decl. ¶¶ 3–14). Even if those statements are taken at face value, De la Cruz has failed to establish that the 1992 EEO charge was causally related to his employment as an APA Performance Monitor or subsequent demotion. Consequently, De la Cruz has not established a *prima facie* case of retaliation with respect to his 1992 EEO charge.

### b. *Workers' Compensation Claim*

The New York Workers' Compensation Law provides the "exclusive remedy" for employees seeking to recover compensation for work-related injuries caused by their employer's negligence. N.Y. Workers' Comp. Law § 29(6). The Workers' Compensation Law likewise provides the exclusive remedy for an employee's claim that his employer discriminated or retaliated against him for filing, or attempting to file, a workers' compensation claim. *Id.* § 120; *Martinelli v. Swissre Holding (N. Am.),* No. 95 Civ. 10996(RWS), 1996 WL 125657, at *3, 1996 U.S. Dist. LEXIS 3328, at *7 (S.D.N.Y. Mar. 19, 1996) ("There is no cause of action for such a claim in the federal district court."). Accordingly, this Court lacks subject matter jurisdiction to entertain De la Cruz's claim that his APA supervisors retaliated against him for threatening to file a workers' compensation claim following his October 15 injury. *See Ridgway v. Metro. Museum of Art,* No. 06 Civ. 5055(SAS), 2007 WL 1098737, at *5–6,

2007 U.S. Dist. LEXIS 27007, at \*26–27 (S.D.N.Y. Apr. 9, 2007) (district court lacks jurisdiction to hear plaintiffs claim that employer retaliated against him because he sought workers' compensation).

### c. *November 9 Memorandum*

■ It is undisputed that the November 9 Memorandum, which De la Cruz sent to Martin and Dannhauser, raised allegations of "differential treatment" and "illegal harassment." (Barrett Decl. Ex. Q). It also is undisputed that, subsequent to his distribution of the November 9 Memorandum, De la Cruz was reassigned to Team Five and later demoted. (Def.'s 56.1 Stmt. ¶¶ 42, 66). De la Cruz has not established, however, that the demotion was causally connected to the November 9 Memorandum, nor has he rebutted the City's legitimate reasons for the adverse employment actions he alleges. Indeed, after De la Cruz sent the November 9 Memorandum, he continued to work as a Performance Monitor. He also received additional training from Linares. (*See* Barrett Decl. Ex. K). Had his APA supervisors wanted simply to retaliate against De la Cruz for raising discrimination complaints in the November 9 Memorandum, Dannhauser presumably would not have given him a second opportunity by reassigning him to Team Five and having Linares devote additional time to his training.

In any event, the temporal proximity between De la Cruz's distribution of the November 9 Memorandum and his demotion is not enough to save his retaliation claim. "Though there is no bright line establishing temporal proximity, 'two months between the protected activity and the adverse employment action seems to be the dividing line.'" *Wright v. N.Y. City Off–Track Betting Corp.*, No. 05 Civ. 9790(WHP), 2008 WL 762196, at \*5

(S.D.N.Y. Mar. 24, 2008) (quoting *Cunningham v. Consol. Edison Inc.*, No. 03 Civ. 3522(CPS), 2006 WL 842914, at \*19 (E.D.N.Y. Mar. 28, 2006) (collecting cases)). Here, however, there is a six-month span between De la Cruz's protected activity and demotion. Moreover, even if that span is deemed sufficient to create an inference of retaliation for purposes of establishing a *prima facie* case, it is insufficient, without more, to rebut the City's proffered legitimate reason for his demotion. *See El Sayed*, 627 F.3d at 933 ("temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext"). Here, De la Cruz has not rebutted the City's non-discriminatory explanation of the reason for his demotion.

Accordingly, summary judgment on De la Cruz's retaliation claim arising out of the November 9 Memorandum must be granted.

### d. *2008 EEOC Charge*

■ De la Cruz's papers provide a laundry list of incidents, some dating back to 2007, which he contends constituted retaliation for his protected activity "in November 2007 and at other times." (Pl.'s Mem. at 4–6). However, De la Cruz's retaliation claim based on the filing of the 2008 EEOC Charge obviously must be limited to incidents that occurred *after* he filed that charge. *See Vital v. Interfaith Med. Cent.*, No. 96 Civ. 363(FBS), 2001 WL 901140, at \*6 (E.D.N.Y. July 31, 2001) (plaintiff's termination prior to filing EEOC charge cannot serve as basis for retaliation claim).

By the time De la Cruz filed the 2008 EEOC Charge, he had already been demoted from his APA position. (*See* Bar-

rett Decl. Ex. V). Consequently, De la Cruz's claim based on that charge must be limited to incidents that occurred after his demotion, which include his assignment to an undesirable office space, his supervisor's delay in providing the tasks and standards for his current position and conducting a performance evaluation, the requirement that he undertake an increased work load, and the planned "abolish[ment]" of his position. (Compl. 4; Pl.'s Mem. at 5). De la Cruz's retaliation claim fails, however, because he has not shown through admissible evidence that any of these alleged acts were (or could reasonably be inferred to be) causally related to the filing of the 2008 EEOC Charge. *See* Fed.R.Civ.P. 56(e); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) (discrimination plaintiff cannot defeat motion for summary judgment by relying solely on "unsupported assertions" or "conjecture"). Thus, the City is entitled to summary judgment on De la Cruz's retaliation claim to the extent it arises out of his 2008 EEOC Charge.

IV. *Conclusion*

For the reasons set forth above, the City's motion for summary judgment, (ECF 19), is granted in its entirety. The Clerk of the Court further is respectfully requested to close this case.

SO ORDERED.